1999 OK CIV APP 17

Wilma L. BRANNON and Charlene Thomas, on behalf of themselves and all others similarly situated, Appellants,

v.

BOATMEN'S NATIONAL BANK OF OKLAHOMA, a National Banking Association; NB Holdings Corporation, a Delaware corporation as successor to Boatmen's Bancshares, Inc.; and T.B.A. of Oklahoma, Inc., an Oklahoma corporation, Appellees.

No. 89,761.

Court of Civil Appeals of Oklahoma, Division No. 4.

Decided Dec. 1, 1998.

Certiorari Denied Feb. 10, 1999.

Tomme J. Fent, Community Legal Services of Oklahoma City, P.C., Oklahoma City, Oklahoma, Daniel A. Edelman, James O. Latturner, Cathleen Combs, Edelman & Combs, Chicago, Illinois, For Appellants.

Joe E. Edwards, Susan Moebius Henderson, Day, Edwards, Federman, Propester & Christensen, P.C., Oklahoma City, Oklahoma, For Appellees Boatmen's National Bank of Oklahoma and NB Holdings.

Mark S. Grossman, Steven W. Ballard, Crowe & Dunlevy, Oklahoma City, Oklahoma, For Appellee T.B.A. of Oklahoma, Inc.

REIF, J.

¶ 1 This appeal concerns the insurance coverage that a seller/secured party can obtain when their buyer/debtor does not provide insurance as set forth in the financing agreement for the buyer/ debtor's purchase of a motor vehicle. The two plaintiffs in this case are buyer/debtors whose financing agreements for the purchase of motor vehicles were assigned to defendant Boatmen's Bank by the original sellers.

¶ 2 The financing agreements in question require the buyer to "insure Collateral with companies acceptable to Seller/Secured Party against such casualties and in such amounts as prudent and adequate to protect Seller/Secured Party or as Seller/Secured Party shall require." The financing agreements further provide that: "At its option ... Seller/Secured Party may ... pay for ... insurance [and that] Buyer agrees promptly to reimburse Seller/Secured Party ... and until such reimbursement the amounts of such expenditures shall be ... secured by this Security Agreement and shall be subject to a FINANCE CHARGE at a rate not exceed-

ing the ANNUAL PERCENTAGE RATE provided herein."

¶ 3 Relying on these provisions, Boatmen's Bank purchased insurance, because plaintiff-buyer Brannon defaulted on her insurance obligation two months into the two-year loan period, while plaintiff-buyer Thomas defaulted on his insurance obligation four months into the one-year loan period.

¶ 4 Plaintiff-buyers contend that Boatmen's Bank could only purchase "casualty insurance" under these provisions and that the insurance notices they received from Boatmen's Bank show insurance other than "casualty insurance" was purchased.[1] Plaintiffs contend that the purchase of coverage other than casualty coverage resulted in an excessive charge, a breach of contract, and a violation of various business practice statutes. Boatmen's Bank admits it purchased the coverages reflected in the notices, but maintains that it was not limited to purchasing "casualty insurance." Boatmen's Bank contends that it could purchase such insurance "as Seller/Secured Party shall require." The trial court agreed with Boatmen's Bank and dismissed plaintiffs' suit. Upon review, we likewise agree with Boatmen's Bank. We hold that the insurance purchased by Boatmen's Bank did not breach the financing agreements, or violate any of the statutory provisions pled by plaintiff-buyers in their petition.

 ¶ 5 The financing agreements expressly reserve the right to the seller/secured party to purchase insurance as it shall require and at its option when the buyer/debtor does not insure the collateral. Pursuant to 14A O.S.1991 § 4–104(1), "a creditor may agree to provide insurance, and may contract for and receive a charge for insurance separate from and in addition to other charges [but] need not make a separate charge for insurance *provided or required by him.*" (Emphasis added.)

---

1. One of plaintiffs' complaints about the insurance obtained by Boatmen's Bank apparently concerns the "Conversion Coverage," "Waiver of Repossession," and "Past Due Payments Coverage." However, these coverages are operative only in the event of a loss of the collateral. In addition, these coverages are not expressly pro-

hibited by the Uniform Consumer Credit Code, and do not otherwise violate 14A O.S.1991 § 4–301 or § 4–106. Finally, any recovery under these provisions would partially benefit a debtor by fully protecting the debtor's equity in the collateral.

¶ 6 Pursuant to section 4–109, "[i]f a creditor *requires* insurance ... the debtor shall have the option of providing the *required* insurance." (Emphasis added.) The notices that plaintiff-debtors admit receiving advised the plaintiff-debtors that they could purchase insurance from their own agent to replace the insurance purchased by Boatmen's Bank.

¶ 7 Additionally, when the financing agreement contains covenants by the buyer to perform certain duties for insurance, and the seller pays for performance of the duties on behalf of the buyer, the seller may add the amounts paid to the debt. 14A O.S. 1991 § 2–208. As expressly concerns insurance, sub-section (1) further states that the secured party need only give buyer notice of "a brief description of the insurance paid for by the seller including the type and amount of coverages." The foregoing statutes clearly support Boatmen's Bank purchase of such insurance as it required. Significantly, 14A O.S.1991 § 4–301 does not restrict purchase of insurance to casualty insurance, but instead, merely places restrictions on any casualty insurance a creditor may purchase. The *casualty insurance* must cover "a substantial risk of loss of or damage to property related to the credit transaction, [be] reasonable in relation to the character and value of the property, [and have a term] reasonable in relation to the terms of credit." It appears that plaintiff-buyers believe that the insurance in question violated section 4–301, because of (1) a zero deductible for any loss claimed by Boatmen's Bank, (2) taking coverage for the purchase price of the insured vehicles, rather than the balance of the loans, and (3) taking coverage for the entire period of the loan, rather than the period of the loan remaining after securing the insurance.

¶ 8 In rejecting these contentions, we first note that without a zero deductible on any loss it may claim, a secured creditor like Boatmen's Bank would not be fully protected. In addition, a zero deductible for the creditor leaves no deficiency in the effective coverage for which the debtor would otherwise bear the risk under section 4–302. Given the fact that both the financing agreements and the foregoing statutes liberally protect a secured creditor's right to insure, we must conclude that a zero deductible is not an unreasonable term for the casualty coverage in question.

¶ 9 Next, use of the purchase price of the vehicles for coverage was clearly reasonable given the responsibility of Boatmen's Bank to act as "attorney" for the buyer/debtors in obtaining insurance and making any claims for covered losses. Just as a zero deductible fully protected the interests of Boatmen's Bank, use of the purchase price fully protected the interests of the buyer/debtors. Again, it ensures there will be no deficiency in the effective coverage for which the debtor would bear the risk under section 4–302. Use of the purchase price as a measure of coverage was "reasonable in relation to the character and value of the property insured." 14A O.S.1991 § 4–301(1)(b).

¶ 10 Lastly, the fact that the "coverage period" coincides with the term of the loan and provided pre-issuance coverage was not unreasonable in relation to the terms of the credit. The secured party is entitled to insurance coverage for loss or damage to the collateral that may have occurred during any period that the plaintiff-buyers did not have insurance in effect including any pre-issuance period. Additionally, Boatmen's Bank would be entitled to pre-issuance coverage for loss or damage that buyer's insurance may have excluded, or that the buyer's insurance was insufficient to cover, such as damage that was less than buyer's deductible. Again, the fact that Boatmen's Bank can secure coverage for pre-issuance loss or damage equally protects and benefits the buyer/debtors.

¶ 11 Although plaintiffs rely on provisions in the Uniform Consumer Credit Code for recovery of "excess charges," and have alleged that the insurance in question constituted such excess charges, they have not pled any facts from which it can be determined that the cost of the insurance in question was "excessive" other than their contention that the insurance was "unauthorized." As discussed previously, the insurance in question was not unauthorized, either by the financing agreements or by statute.

¶ 12 Section 4–107 expressly addresses the amount that a debtor can be charged when the secured creditor obtains insurance. The statute states, "if a creditor contracts for or receives a separate charge for insurance, the amount charged to the debtor for the insurance may not exceed the premium to be charged by the insurer, as computed at the time the charge to the debtor is determined, conforming to any rate filings required by law and made by the insurer with the Insurance Department." In the instant case, the separate charge for insurance by Boatmen's Bank was "the premium to be charged by the insurer." The plaintiff-debtors did not allege that "the premium to be charged" failed to conform to the rate filings by the insurer herein. They also did not allege that "the insurance [was] prohibited under any statute, or rule thereunder, governing the business of insurance." *See* 14A O.S.1991 § 4–104(1).

¶ 13 Plaintiff-buyers' multiple causes of action and theories of recovery all spring from the premise that Boatmen's Bank violated the Uniform Consumer Credit Code and breached the financing agreement. However, the exhibits attached to plaintiff-buyers' petition reveal that Boatmen's Bank acted in conformity with the Uniform Consumer Credit Code and the financing agreement. Proper performance of legal obligations under both the contract provisions and the specific statutory law that governs the insurance transactions in question legally and logically forecloses plaintiff-buyers' derivative theories of fraud, deceptive trade practices, bad faith, and unfair trade practices under the consumer protection act.

■ ¶ 14 Even the assumed truth of plaintiff-buyers' allegation that Boatmen's Bank was paid a "commission" for purchasing the insurance in question does not make the purchase of the insurance wrongful. Boatmen's Bank was under no duty to disclose or share any financial incentives it received from taking its "force placed" insurance business to the insurer in question. Section 4–108(2) expressly provides that "the creditor [is not required] to account to the debtor for any portion of a separate charge for insurance because ... the creditor receives directly or indirectly under any policy of insurance a gain or advantage not prohibited by law."

¶ 15 In essence, plaintiff-buyers complain about their secured creditor exercising a right given under both the financing agreement and statutory law. They downplay the fact that it was their failure to perform an obligation under the financing agreement that led to their secured creditor's exercise of its right. They seek the recognition of various causes of action against the secured creditor for its exercise of contractual and statutory rights, despite receipt of notice that (1) the secured party was exercising its right, (2) the manner in which the secured party was exercising its right, and (3) the cost for the secured party to exercise its right. They were given opportunity to contest the secured party's acts and to rectify their default. In view of the fact that plaintiffs were given both the right and opportunity to avoid the costs of the secured party exercising its insurance rights, we fail to see why their inaction should constitute a sufficient basis to judicially fashion further protections and remedies for them.

¶ 16 If Boatmen's Bank did nothing wrong or actionable in purchasing the insurance from defendant-insurer T.B.A. of Oklahoma, Inc., it legally and logically follows that T.B.A. did nothing wrong or actionable vis-*a*-vis the plaintiff-debtors in selling the insurance in question to Boatmen's Bank. The trial court did not err in granting the motions to dismiss of the defendants. In view of the plaintiff-debtors' election to not amend and to stand on their petition, the judgment dismissing this cause as to both defendants—Boatmen's National Bank of Oklahoma (and its successors) and T.B.A. of Oklahoma, Inc.—is AFFIRMED.

STUBBLEFIELD, P.J., concurs, and RAPP, J., dissents.

RAPP, J., dissenting

¶ 1 I dissent. I am required to state, as a prelude to my analysis, that, in my view, the majority fails to consider and give effect to the parties' written contract and to the consumer protection that the Uniform Consumer Credit Code ("UCCC") was designed

to provide. The effect of the majority in discussing what is permissible under the UCCC is to condone what the Bank actually did in total disregard of its contract. The real issues here are twofold. First, is the Bank required to conform to its contract which, on close reading, does not authorize the Bank's purchase and charge back to buyer/debtor of insurance? Second, what authority gives the Bank the right to have force placed insurance extending beyond the period of default and overlapping prior coverage it obviously initially approved? The answer to the first is "yes" and the answer to the second is "none."

¶ 2 Each of the Plaintiffs bought a used car from a dealer. Each signed a retail installment contract containing the same terms on a form approved by the Bank. The Plaintiffs were required by their contracts to provide casualty insurance on the cars. At some point in the contracts' lives, the Plaintiffs failed to maintain insurance. The Bank obtained insurance using TBA as the insurance agency.[2] This matter arises from the Plaintiffs' allegation that Boatmen's National Bank ("Bank"), in conjunction with T.B.A. of Oklahoma, Inc. ("TBA") wrongfully charged Plaintiffs for the Bank's purchase of unwarranted insurance, together with interest, in excess of the Bank's authority.[3]

## I. BACKGROUND

¶ 3 Bank obtained force-placed insurance through TBA, an insurance agency. The record shows plaintiff Brannon borrowed about $7,717.57 on July 30, 1993, payable in 24 monthly installments of $399.99 for a total of payments of $9,599.76. The Bank obtained force-placed insurance on October 1, 1993, in the amount of $1,934, covering a two-year period dating back to the loan inception

date. Plaintiff Thomas borrowed $7,604.24 on October 26, 1991, payable in 36 installments of $276.97 for a total of payments of $9,970.92. The Bank obtained $1,310 in force-placed insurance on February 26, 1992, covering a one-year period again dating back to the loan inception date.

¶ 4 Bank added the insurance costs to the balances due and began charging interest on the funds advanced by the Bank to purchase the insurance at the note rate. Plaintiffs received notice of this insurance cost in a form letter from TBA, stating Bank had purchased insurance and added the amount to each loan. The letter stated that if Plaintiffs wished to purchase other insurance, they could do so and have the force-placed insurance canceled. Plaintiffs also received a copy of the insurance certificates, which stated the insurance provided physical coverage protecting only the interest of the insured, and not the borrower. The policy sent Brannon stated:

INTEREST: WILL ACCRUE
BASED ON APR: 21.000

ADDED TO LOAN: 1,934.[4]

Plaintiffs asserted when they attempted to make what they thought were the final payments on their contracts, they learned they owed more than $4,000 apiece due to the force-placed insurance and interest.

## II. PROCEDURAL HISTORY

¶ 5 Plaintiffs brought a class action against Bank, its holding company, and TBA. Essentially, Plaintiffs asserted Bank:

* * * charged them more than the cost of the insurance;

---

2. This type of insurance is known as "force-placed" insurance. The record does not show whether TBA was competitive with other agencies or brokers, nor does it show if there were any financial benefits to the Defendants other than the obvious financial charges earned by Bank and profits for TBA.

3. Moreover, this is an appeal from an order sustaining a motion to dismiss for failure to state a claim. This court, on review, asks only whether relief is possible under any set of facts that could be established consistent with the allega-

tions. *Indiana National Bank v. State Department of Human Services*, 1994 OK 98, 880 P.2d 371. The judgment may not be sustained unless it appears without doubt that the plaintiff can prove no set of facts in support of the claim entitling him to relief. *Brown v. Founders Bank & Trust Company*, 1994 OK 130, 890 P.2d 855.

4. The policy sent Thomas included similar language, except it listed her interest rate at 18 per cent and the amount added to the loan at $1,310.

\* \* \* obtained "additional and unauthorized coverage, including covering default by the consumers on their payment obligations;"

\* \* \* bought insurance at exorbitant prices (by purchasing policies with no deductible);

\* \* \* obtained a commission on the insurance it purchased; and,

\* \* \* acted to defraud customers.

¶ 6 Plaintiffs asserted Bank breached their contracts and violated the Oklahoma Consumer Protection Act, the Oklahoma Deceptive Trade Practices Act, the Uniform Consumer Credit Code, and the Uniform Commercial Code. Plaintiffs, as to TBA, asserted only violations of the Consumer Protection Act and the Deceptive Trade Practices Act.

¶ 7 Defendants filed motions to dismiss for failure to state a claim upon which relief can be granted, under authority of 12 O.S. 1991 § 2012(B)(6), which the trial court granted and the Plaintiffs appealed.[5]

### III. ANALYSIS AND REVIEW

#### 1. *Uniform Consumer Credit Code.*

¶ 8 The Plaintiffs claim under the UCCC flows from their allegation that the Bank's purchase of the force-placed insurance *of the type obtained* was not authorized by the parties' contract. Plaintiffs further claim that the notices sent after the insurance was obtained were misleading under the Code. The Bank's first defense is that it was authorized to purchase this particular insurance and charge Plaintiffs therefor both by the contract and the Code. Secondly, the Bank asserts that the petition and the notices attached reflect adequacy of notice.

¶ 9 The majority here fails to take account of the fact that there is a written contract which governs the respective rights and obligations of the parties. In so doing, the majority *assumes* that all the matters *permitted* by the UCCC are in fact included in the contract. The correct place of beginning here is with the full text of the relevant two paragraphs of the contract and what the Bank did and did not do pursuant to those paragraphs. These paragraphs state:

9. Adequate Insurance. Buyer at own expense shall insure Collateral with companies acceptable to Seller/Secured Party **against such casualties** and in such amounts as prudent and adequate to protect Seller/Secured Party or as Seller/Secured Party shall require. **All insurance policies shall be written for the benefit of Buyer and Seller/Secured Party as their interests appear** and such policies or certified copies thereof evidencing same shall be furnished to Seller/Secured Party within 10 days of date of this agreement. All policies of insurance shall provide for at least ten days prior written notice of cancellation to Seller/Secured Party. Seller/Secured Party may act as attorney for Buyer in the procuring of insurance, in making, adjusting, and settling claims under or canceling such insurance and in endorsing Buyer's name on any drafts or checks drawn by insurers of Collateral.

10. Expenditures of Seller/Secured Party. At its option and after any written notice to Buyer required by law, which notice Buyer and Seller/Secured party hereby agree is sufficient if mailed, postage prepaid, to the address of Buyer provided for herein at least ten days before the commencement of the performance of the duties specified herein, it is agreed Seller/Secured Party may discharge taxes, liens, security interests or other encumbrances on the Collateral and may pay for the repair of any damage to the Collateral,

---

**5.** I agree that the dismissal Plaintiffs' claims against both Defendants premised upon the Oklahoma Deceptive Trade Practices Act was correct. However, the reason is not that these claims derive from the UCCC theory. The Deceptive Trade Practices Act is designed to provide a remedy for injury incurred in the competitive arena. Moreover, by analogy to the concept of "goods" in secured sales, "forced-placed" insurance is not covered in the Act.

I also agree that the trial court correctly dismissed Plaintiffs' Consumer Protection Act claims against TBA because they did not allege any contractual or other relationship between them and TBA giving rise to any duty on the part of TBA to conform to the Act vis' the Plaintiffs. Moreover, Plaintiffs declined the opportunity to amend their petition.

Therefore, the trial court correctly dismissed TBA.

for the maintenance and preservation thereof and for insurance thereon. **Buyer shall be liable for and agrees to pay Seller/Secured Party for all expenditures of Seller/Secured Party for taxes on the Collateral for the discharge of liens, security interest or other encumbrances on the Collateral, for the repair of any damage to the Collateral, and for all costs, attorney's fees and other disbursements of Seller/Secured Party in connection with the foregoing.** Buyer agrees promptly to reimburse Seller/Secured Party for all such expenditures and until such reimbursement the amounts of such expenditures shall be considered a liability of Buyer to Seller/Secured Party which is secured by this Security Agreement and shall be subject to a FINANCE CHARGE at a rate not exceeding the ANNUAL PERCENTAGE RATE provides herein. In addition, Buyer shall be liable for and agrees to pay Seller/Secured Party for all costs, attorney fees and other disbursements of Seller/Secured Party as allowed by law or provided for herein in the enforcement or collection of any note, warranty, or liability of Buyer to Seller/Secured Party, or in the realization upon or the enforcement or collection of any amount receivable, contract right, promissory note, chattel paper, instrument, document or other Collateral in which Seller/Secured Party has a security interest. Buyer agrees promptly to reimburse Seller/Secured Party for all such expenditures and until such reimbursement the amount of such expenditures shall be considered a liability of Buyer to Seller/Secured Party which is secured by this Security Agreement.

¶ 10 The Bank violated these paragraphs and obtained a policy which covered non-casualty losses as well as casualty losses with zero deductible. Moreover, taking the petition's allegations as true, the Bank insured itself for the full amount of the loan and the full term of the loan in Brannon's case, even though the Bank had been partially paid when the insurance was obtained and part of the loan period had elapsed for which Bank approved insurance existed. The result was a higher premium, greater interest income to the Bank and, in consideration of the loan amount coverages, constituted the purchase of insurance for coverage amounts larger than any claim could be made.

### a. Authority Derived From Contract.

¶ 11 At outset it is to be observed that the contract here is Bank's contract and is a contract of adhesion.[6] Any contract language which is on a standardized or printed form or which is ambiguous or uncertain is construed most strongly against the drafter of the contract. *Dismuke v. Cseh*, 1992 OK 50, 830 P.2d 188; *Wilson v. Travelers Insurance Company*, 1980 OK 9, ¶ 8, 605 P.2d 1327; *Vince Allen & Associates, Inc. v. Delhi Gas Pipeline Corp.*, 1989 OK CIV APP 56, 788 P.2d 414.

¶ 12 Examination of the Bank's contract here focuses upon the paragraph's dealing with the purchase and maintenance of insurance. Paragraph 9 of the Bank's prepared contract requires that buyer obtain *casualty* insurance suitable to Bank as secured party. Not only does the contract specify "casualty" insurance but it also directs that the policy **"shall be written for the benefit of Buyer and Seller/Secured Party."** The secured party is authorized to act as buyers attorney to procure this insurance. Paragraph 9 does not, however, authorize the Bank here to obtain the type of insurance it did, that is, insurance covering items other than "casualty" and which also did not cover the Plaintiffs as Buyers. Moreover, the phrase "as their interests appear" contained in this Paragraph does not authorize the Bank to "over-insure" or to insure for an interest that does not exist, that is, for a loan balance that exceeds the amount due and, by backdating the contract, create an insurance interest greater than the term remaining on the loan contract and resulting in duplication of insurance.

---

6. An "adhesion contract" is a standardized contract prepared entirely by one party for acceptance by the other on a "take it or leave it" basis without opportunity for bargaining. *Max True Plastering Company v. United States Fidelity and Guaranty Company*, 1996 OK 28, 912 P.2d 861.

¶ 13 Further, Paragraph 9, read together with Paragraph 10, does not, after the initial procurement of insurance at contract inception, require Plaintiff to pay for Bank's insurance purchase as shown in the next Paragraph. Paragraph 10 does not assist Bank. This Paragraph states that the Bank "may pay ... for insurance" on the collateral and sundry other items such as taxes and liens. Then, the next sentence lists specifically those items which Buyer agrees to reimburse and pay. These items are subject to the lien of the security agreement and a finance charge. *This specific list omits the purchase of insurance.* Payment for an insurance purchase is not incorporated by the generality of the phrase "and other disbursements ... in connection with the foregoing." When, as here, the enumeration of specific things is followed by general words or phrase, then such words or phrase is held to refer to things of the same kind. *Cronkhite v. Falkenstein*, 1960 OK 118, & 12, 352 P.2d 396; *West v. Aetna Life Insurance Company*, 1974 OK CIV APP 61, ¶ 21, 536 P.2d 393. Thus, under the contract, the Bank does not have the right to charge back the insurance it purchased to Buyer and add a finance charge therefore measured by the contract's finance charge against the Plaintiffs.

### b. *Authority Derived From Code.*

¶ 14 If the agreement requires the buyer to insure the collateral then the Code permits the *seller* to add to the debt amounts paid for performance of a contract. 14A O.S.1991 § 2–208(1). The term "seller" includes the seller's assignee and thus the Bank. 14A O.S.1991 § 2–107. As shown above, Paragraph 9 requires the buyer to insure the collateral for casualty losses. However, the credit made for the sums advanced for insurance may not exceed the amount disclosed to Buyer "pursuant to the provisions on disclosure" under the Code. 14A O.S.1991, § 2–208(2).

¶ 15 Section 2–208 is not a blanket authority to the Bank to obtain insurance. Section 2–208 only authorizes the seller to perform the covenant of the buyer and then charge the buyer therefore plus interest at the disclosed contract rate. Here, the allega-tions of the petition, taken as true, *reflect that the Bank acted both in excess of and outside its Code authority.* Moreover, Bank's purchase and notice thereof must comply with the Code. The record fails to show Bank acted accordingly.

¶ 16 Section 2–208 of the Code requires Bank, within a reasonable time after purchasing the insurance, to "state to the buyer in writing the amount of the sums advanced, any charges with respect to this amount, if required a revised payment schedule and, if the duties of the buyer performed by the seller pertain to insurance, a brief description of the insurance paid for by the seller including the type and amount of coverages." The record shows the notice Bank gave Plaintiffs did not include a revised payment schedule. For example, though the notice did inform Brannon that $1,934 would be added to her loan balance, it did not inform her that by continuing her previously agreed-upon monthly payments, she would be liable for an additional amount of $4,000 at the end of the loan's term—a sum *ten times* her monthly payment and over half of the amount originally borrowed. *See Bank of Oklahoma v. Portis*, 1997 OK CIV APP 32, 942 P.2d 249.

¶ 17 In a separate argument, Bank relies on the language of UCCC section 4–108(2)(c). That section does not require the creditor in some circumstances to account to the debtor for any portion of a separate charge for insurance where "the creditor receives directly or indirectly under any policy of insurance a gain or advantage not prohibited by law." However, that section is not here dispositive of the motion to dismiss. Plaintiffs have asserted this is a case where the Bank's gain is "prohibited by law." Besides, while the statute may allow Bank to retain certain gains, it does not allow Bank to do so at Plaintiffs' expense.

¶ 18 Additionally, Plaintiffs asserted facts which, if true, would allow for recovery under section 4–301, which limits the costs of the purchased insurance to amounts "reasonable in relation to the character and value of the property insured." Plaintiffs asserted Bank purchased insurance at unreasonably high levels by purchasing "no-deductible" insur-

ance. On this theory, then, the trial court also erred in granting the motion to dismiss.

### 2. *Breach of Contract.*

¶ 19 The Bank's contractual authority for any action relative to insurance is specified in Paragraphs 9 and 10 of its form agreement. This authority is limited and specific.

¶ 20 The Bank had authority to only obtain a casualty insurance policy which benefitted *both* Buyer and Seller. The Bank did not have contractual rights to obtain the type of insurance it obtained; to "over insure"; or to insure for a non-existent risk, that is, for a loan amount previously paid and not due under the finance contract. Moreover, as set out earlier in section 1(a), the Bank did not have a right to charge for the insurance purchased upon expiration of the original insurance. Under the contract, the Bank became, at best, a gratuitous volunteer protecting its own interest evidenced by its contract purchase. Further, the Bank did not have a contractual right to collect a finance charge for any sums advanced for such excess and unauthorized insurance. The security agreement lien did not extend to the sum paid by the Bank for the unauthorized insurance and, therefore, the Bank had no right to foreclose for nonpayment of this sum.

¶ 21 Thus, insofar as review under a motion to dismiss is concerned, it is clear the Plaintiffs' allegations establish several breaches of the contract by the Bank. These breaches began with procurement of type and scope of insurance not authorized and ended with foreclosure of a lien not held.

### 3. *Remaining Claims.*

¶ 22 The Plaintiffs' petition alleges a cause of action under the Oklahoma Consumer Protection Act, 15 O.S.1991 §§ 751 et seq. The Bank asserts that the exemption provision of Section 754(2) justifies dismissal because the Bank is a regulated entity. However, the Bank's argument does not point to any specific instance of regulation, but rather requires this Court *to assume* that the *specific* actions of which Plaintiffs complain are so regulated simply because the Bank is itself a regulated entity. This is specious.

¶ 23 The Bank's argument at this stage is hopelessly flawed. The argument interjects a factual question into the decision-making process. An exemption is an affirmative defense which must be raised in the pleadings. 12 O.S.1991, § 2008(C)(20). In light of the principles applicable to a review of a decision to dismiss for failure to state a claim, the trial court erred by sustaining the motion on the premise that the facts will support the Bank's affirmative defense.

¶ 24 The trial court also erred in granting Bank's motion to dismiss as to its potential liability under the UCC's provisions regarding a secured party's right to dispose of collateral after default, 12A O.S.1991 and Supp.1997 § 9–504 through 9–507. Every contract or duty within the UCC imposes an obligation of good faith in its performance or enforcement. 12A O.S.1991 § 1–203. This obligation, and the requirement that the disposition be in a commercially reasonable manner, are the principal limitations on the secured party's right to dispose of collateral. *See* UCC comment to 12A O.S. Supp.1997 § 9–507. Plaintiffs assert Bank wrongfully inflated the cost of the insurance by purchasing "no-deductible" insurance and by purchasing more than the "casualty" insurance required in the Bank's contract. This assertion, if Plaintiffs can prove it to the satisfaction of the trier of fact, would show a lack of good faith on Bank's part and would obviously affect their right to redeem their cars.

### IV. *CONCLUSION*

¶ 25 The Plaintiffs' petition states a cause of action against the Bank. When the full relevant terms of the Bank's contract are compared to what the Bank is alleged to have done it is clear that the Plaintiffs are entitled to the opportunity to prove their case.

¶ 26 I would reverse and remand for further proceedings.