2016 OK CIV APP 73

**Michael GRINDSTAFF and Debbie Grindstaff, Plaintiffs/Appellants,**

**v.**

**The OAKS OWNERS' ASSOCIATION, INC., Defendant/Appellee.**

**Case No. 112,671**

Court of Civil Appeals of Oklahoma, Division No. 2.

FILED APRIL 25, 2016

Mandate Issued: 12/01/2016

4. Kenneth W. Clarkson, Roger LeRoy Miller, Frank B. Cross, *Business Law Text and Cases,* 12 (13th Ed. 2015).

Timothy B. Hummel, Oklahoma City, Oklahoma, for Plaintiffs/Appellants

Cara S. Nicklas, McALISTER & McALISTER LAW FIRM, P.C., Edmond, Oklahoma, for Defendant/Appellee

OPINION BY DEBORAH B. BARNES, JUDGE:

¶ 1 Plaintiffs/Appellants Michael and Debbie Grindstaff (Homeowners) sustained damage to their property as a result of water eroding the bank of a creek behind their home. Homeowners asserted several theories—including negligence and breach of contract—against their neighborhood homeowners association, Defendant/Appellee Oaks Owners' Association, Inc. (HOA). Homeowners appeal the Order in which the trial court, following a three-day nonjury trial, found the damage "was due to erosion," and "rule[d] that the June 2010 storm was an act of God and/or force majeure under" the pertinent terms of the neighborhood homeowners association bylaws. In addition, the trial court found Homeowners failed to mitigate their damages, stating: "The evidence was clear that [Homeowners] took no action to address the continuing erosion issues on their property other than putting tarps over the soil." The court found HOA did have a duty "to maintain and repair" the common area behind Homeowners' property, but the court ruled this duty did "not include a duty to affirmatively install erosion control" to prevent the natural erosion of the banks of the creek. The court found HOA's duty to maintain and repair required it, instead, to "keep[] the channel free of debris and fallen trees," and found HOA met this duty by keeping the creek clear of such debris. Con-

sequently, the court ruled in favor. of HOA. Based on our review, we affirm.

## BACKGROUND

¶ 2 Homeowners filed their original petition in May 2011. Homeowners initially named both HOA and the City of Oklahoma City (City) as defendants in their original petition and first amended petition. As against City, Homeowners alleged it. was negligent in failing to properly perform its duties to inspect, maintain, limit and otherwise secure a proper flow of water. City filed an answer in which it asserted, among other things, that it is exempt from liability under the Governmental .Tort Claims. Act, 51 O.S. §§ 151–172. In September 2012, City was dismissed from this action by Homeowners without prejudice.

¶ 3 In March 2013, Homeowners filed their second amended petition against HOA only, and the case proceeded against HOA. HOA filed an answer asserting, among other things, that the damages sustained by Homeowners "were caused by an Act of God and precluded under the terms of the By–Laws," and that Homeowners' lot "abuts a naturally occurring creek" and Homeowners had an "obligation to take reasonable steps to protect their own property from the effects of erosion."

¶ 4 At trial, Homeowners asserted in their opening statement that HOA was charged with the duty of maintaining the common elements, including the creek behind their property; they asserted this duty was "a proactive duty, not a reactive duty." Homeowners asserted that, as members of HOA by reason. of their ownership of their lot which they purchased in 1991, they had "no issue about the stability of [their] lot or the drainage channel" until the late spring or early summer of 2007 when a large tree, standing on the bank of the creek closest to Homeowners' property, collapsed into the creek, taking with it a portion of the creek bank. At this time, although their property was not yet damaged in any way, Homeowners asserted they sent a letter to HOA advising HOA of the situation and expressing their belief that the tree was a healthy tree which collapsed as a result of "long-term erosion from the creek activity." Homeowners asserted they stated in the letter that although the creek bank had been relatively stable for the last seventeen years, "this tree fall and the heavy recent rainfalls [have] caused some creek bank erosion which has the potential to damage our property."

¶ 5 Homeowners' asserted that HOA's response to this letter was, in essence, that HOA was not responsible and "it's really the City's problem." They asserted that HOA also expressed to Homeowners that HOA did "not want to create a situation in which [HOA] becomes responsible for erosion, fences, retaining walls, etc." Homeowners' asserted, however: "it's clear from the [covenants and bylaws] that it is [HOA's] duty, not the City's" or "the individual homeowners." They asserted that although HOA, in September 2007, did remove the collapsed tree out of the creek, HOA never hired an engineer, and never performed any inspections, in an effort to prevent creek bank erosion.

¶ 6 Homeowners' asserted the damage to their property first occurred in June 2010 when "there was a significant rain[.]" They asserted that as a result of this rainstorm another large tree collapsed, this time taking a "large portion" of their lot abutting the common area. Although the water in the creek did not rise above the banks, Homeowners asserted the large quantity of rainwater flowing through the creek caused "scouring and erosion down at the base of the bank which affect[ed] the top of it."

¶ 7 Homeowners' asserted that after continued correspondence with HOA, HOA stated it was not its responsibility to prevent erosion or to repair the damage caused by the erosion. Homeowners then filed the lawsuit in May of 2011.

¶ 8 Homeowners' further asserted that, following the filing of the lawsuit, the erosion of the creek bank continued through 2012 and 2013, and, as a result of further rains "that happened May 2013, . . . [Homeowners' back porch is now] hanging over the edge" of the creek.

¶ 9 HOA admitted at trial that damage has occurred to Homeowners' property as a result of erosion. HOA stated that when Home-

owners purchased their lot in 1991, the lot backed up to a natural creek channel, a "channel that naturally and constantly erodes." Regarding the June 2010 rainstorm, HOA asserted "it was considered to be a 500–year storm event,"[1] a storm that filled "the creek channel with an unprecedented amount of water that took out a portion of the creek banks along the back of [Homeowners'] property."

¶ 10 HOA stated that, as a neighborhood homeowners association, it "is comprised of 152 lot owners who live in The Oaks subdivision," including Homeowners, and "[e]ach year these homeowners ... elect board members from among the homeowners who ... serve on the Board of Directors for a one-year term." HOA asserted:

> [T]he question in this case is really whether these volunteered board members ... who served these one-year terms used ordinary care in maintaining the natural creeks that flowed throughout The Oaks subdivision and whether these board members reasonably interpreted the covenants, conditions, and restrictions, ... and the bylaws in carrying out their responsibilities as board members for the HOA.

¶ 11 HOA admitted it had a responsibility to "maintain and repair" the creek, but asserted this only "means [it had the responsibility] to keep the water flowing properly through the creek channel" and that it "must remove trees and clear out debris so that [such objects don't] dam up the water flowing through the creek."

¶ 12 HOA admits, below and on appeal, that it did *not* install erosion control measures to protect Homeowners' property from the natural erosion of the creek. HOA states in its Answer Brief on appeal as follows:

> There was no factual question about whether [HOA] did or did not install erosion control measures in order to protect [Homeowners'] property. [HOA] did *not* install such measures and took the position that the contract did not require [HOA] to affirmatively install erosion control in the Common Area in order to protect [HOA's]

property from the natural flow of water through the creek.

Rather, HOA asserts that such erosion is part of the natural, existing state of the creek, which is to constantly change and erode. It states:

> [HOA] has historically determined that its duty to maintain and repair does not require that it keep a natural creek from changing. The "existing state" of a creek channel is to constantly change and erode. [HOA] does not have a duty to prevent the creek from doing what it naturally does.

HOA asserts it met its duty by removing debris from the creek.

¶ 13 As stated above, the trial court found HOA met its duty by keeping the channel free of debris after concluding HOA's duty did "not include a duty to affirmatively install erosion control" to prevent the natural erosion of the banks of the creek flowing through the common area. The court also cited the force majeure subsection contained in HOA's Bylaws, finding "that the June 2010 storm was an act of God and/or force majeure under" that language. Finally, as quoted above, the court found Homeowners failed to mitigate their damages, stating: "The evidence was clear that [Homeowners] took no action to address the continuing erosion issues on their property other than putting tarps over the soil."

¶ 14 From the trial court's Order ruling in favor of HOA, Homeowners appeal.

## STANDARD OF REVIEW

¶ 15 The standard of review to be applied to the trial court's findings of fact is as follows:

> In a non-jury trial the trial judge acts as the trier of fact and those findings are entitled to the same weight and consideration that would be given to a jury's verdict. In an action at law the findings of fact by the trial court have the same force and effect as the verdict of a jury, and those findings will not be disturbed upon appeal

---

1. We note that in Homeowners' Exhibit 84, the June 2010 storm was described as a "100 year storm event."

where there is any evidence reasonably tending to support the findings. Thus, on appeal, we must accept the findings of fact made by the trier of fact if those findings are supported by competent evidence.

*Hagen v. Indep. Sch. Dist. No. I–004,* 2007 OK 19, ¶ 7, 157 P.3d 738 (citations omitted).

¶ 16 In addition, issues of law are presented on appeal relating to statutory interpretation and contract construction.[2] We review issues of law *de novo,* without deference to the trial court's legal rulings. *Kluver v. Weatherford Hosp. Auth.,* 1993 OK 85, ¶ 14, 859 P.2d 1081.

## ANALYSIS

¶ 17 The parties agree that, under the homeowners association covenants and by-laws, HOA had a duty to "maintain and repair" the common areas. However, as indicated above, the parties disagree as to the precise meaning and requirements of this duty under the circumstances presented. The Oklahoma Supreme Court has stated:

> A contract must be considered as a whole so as to give effect to all its provisions. The language in a contract is to be given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept. If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners examination of the instrument.

*Pitco Prod. Co. v. Chaparral Energy, Inc.,* 2003 OK 5, ¶ 14, 63 P.3d 541 (footnotes omitted). "A contract should receive a construction that makes it reasonable, lawful, definite and capable of being carried into effect if it can be done without violating the intent of the parties." *May v. Mid–Century Ins. Co.,* 2006 OK 100, ¶ 22, 151 P.3d 132 (footnote omitted).

¶ 18 Furthermore, "[t]he mere fact the parties disagree or press for a different construction does not make an agreement ambiguous." *Pitco,* ¶ 14. "A contract is ambiguous when it is fairly susceptible to two different constructions, so that reasonably intelligent [people], on reading the contract, would honestly differ as to its meaning." *Id.* ¶ 14 n.19.

### I. The Pertinent Language Contained in the CCRs and Bylaws

¶ 19 The parties agree they are bound by the "Amended Declaration of Covenants, Conditions and Restrictions" (the CCRs),[3] which provide, in pertinent part, as follows:

1. Definitions. Unless the context shall expressly provide otherwise:

. . . .

1.3 "Common Elements" means all portions of the real estate development other than the Lots, any parcels withheld by or deleted from this Declaration by Declarant, and publicly dedicated real property which is designated by the Association or reflected on the Plat as a Common Element or Common Lot.

The CCRs further provide:

8. Owner's Maintenance and Insurance Responsibility of Lot and Improvements. For purposes of maintenance, repair, alteration, remodeling, and insurance (hazard and liability), *an Owner shall be deemed to be responsible for all portions of the Lot (whether developed or not).* In furtherance

---

**2.** "If language of a contract is clear and free of ambiguity the court is to interpret it as a matter of law," and the issue of "[w]hether a contract is ambiguous and hence requires extrinsic evidence to clarify the doubt is a question of law for the courts." *Pitco Prod. Co. v. Chaparral Energy, Inc.,* 2003 OK 5, ¶ 12, 63 P.3d 541 (footnotes omitted). Moreover, "[w]e review the meaning assigned by the trial court to a contract as a legal question." *May v. Mid–Century Ins. Co.,* 2006 OK 100, ¶ 22, 151 P.3d 132 (footnote omitted). Likewise, "[s]tatutory interpretation, involving a question of law, also demands a *de novo* review standard." *Samman v. Multiple Injury Trust Fund,* 2001 OK 71, ¶ 8, 33 P.3d 302 (citation omitted).

**3.** Indeed, subpart 25.5 of the CCRs, entitled "Covenants to Run With the Land," provides that the CCRs "shall run with and bind the Real Estate Development and shall inure to the benefit of and be enforceable by the Association or any member, their respective legal representatives, heirs, successors and assigns."

thereof, the Owner of any Lot shall have the duty of and responsibility for keeping the premises (whether improved or not), Building (both interior and exterior), improvements, appurtenances, and landscaping on his Lot in a well maintained, safe, clean, and attractive condition at all times. If, in the opinion of the Board of Directors of the Association, the Owner fails to fulfill his duty and obligation, the Association shall have the right and power to perform such care and maintenance ("Default Maintenance"), and the Owner shall be liable for the costs thereof. . . .

9. Association's Maintenance and Insurance Responsibility. *The Association shall be responsible for the maintenance, repair, alteration, remodeling, and insurance (hazard and liability) of the Common Elements* and, as contemplated at Paragraph 8, Default Maintenance.

(Emphasis added.)

¶ 20 The CCRs also provide that all lot owners are obligated to equally contribute toward assessments imposed by the Board of Directors to meet any common expenses, and the CCRs further provide:

13.6 Benefit of Assessment or Association Earnings. No part of the assessments or net earnings of the Association shall inure to the benefit of any Lot Owner or individual, except to the extent that Lot Owners receive the benefits from the maintenance, repair, operations, additions, alterations, improvement, and insurance responsibility of the Association.

¶ 21 In addition, the parties agree they are bound by the "By–Laws of [HOA]," which provide, in pertinent part, as follows:

4.3 Other Powers and Duties. Such *powers and duties of the Board of Directors shall include . . . the following*, all of which shall be done for and on behalf of the Owners of the Project:

. . . .

4.3.3 Maintenance. *To keep in good order, condition, and repair all of the Common Elements* and all items of common personal property used by the Owners in the enjoyment of the entire premises, and to perform Default Maintenance obligations described in the Declaration.

. . . .

4.3.11 Manage. *To make repairs, additions, alterations, and improvements to the Common Elements consistent with managing the Project in a first class manner and consistent with the best interests of the Lot Owners.*

(Emphasis added.) On the other hand, regarding the lot owners themselves, subpart 10.4.1 provides that "[e]very Owner must perform promptly, at his own expense, all maintenance and repair work of his Lot (whether improved or not) and of the improvements on his Lot (once improved)."

¶ 22 Furthermore, subpart 4.14 of the By-laws provides that Board members shall not "receive any compensation for acting as such." Article 13 of the Bylaws provides that HOA "is not organized for profit," and no member is entitled to receive any profit from HOA or from the operation thereof.

¶ 23 Finally, the Bylaws provide as follows:

15.3 Exculpation of Unavoidable Loss. The Association shall not be liable for any loss to any Owner or inflicted upon any Lot or the property of the Owner situated therein, brought about by flooding, water damage caused by bursted pipes, acts of God or other force majeure. It is intended that for losses of this nature, each Owner will bear the same or effect his own insurance to cover the same. Each Owner may obtain additional insurance at his own expense for his own benefit. Insurance coverage on all furnishings and decorations and other items of personal property belonging to an Owner and casualty and public liability insurance coverage within each individual Lot are specifically made the responsibility of the Owner thereof.

II. Homeowners' Adhesion Argument

¶ 24 Homeowners first argue that the CCRs and Bylaws constitute a contract of adhesion, and that the provisions should be construed accordingly.

An adhesion contract is a standardized contract prepared entirely by one party to the transaction for the acceptance of the other. These contracts, because of the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected on a "take it or leave it" basis without opportunity for bargaining—the services contracted for cannot be obtained except by acquiescing to the form agreement.

*Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 1996 OK 28, ¶ 7, 912 P.2d 861 (footnote omitted). The party signing an adhesion contract is "in a weaker position (usually a consumer), who adheres to the contract with little or no choice about its terms." *Graziano v. Stock Farm Homeowners Ass'n, Inc.*, 361 Mont. 332, 258 P.3d 999, 1004 (2011). In *Graziano*, the Supreme Court of Montana concluded that the CCRs in that case were "not a contract of adhesion," explaining as follows:

First, the CCRs are not a standard form contract without negotiable terms. The CCRs were drafted specifically for the benefit of the *land* within Stock Farm, run with the land, and bind all successive landowners. Further, Graziano has the ability to change the terms of the CCRs. Graziano may not have had the ability to negotiate the terms of the original CCRs, but it is within his power to change and amend the CCRs in accordance with the amendment provisions in Section XVII of the CCRs. *Id.* at 1004.[4]

■ ¶ 25 Here, the CCRs and Bylaws appear to have been drafted solely for the benefit either of the land or the successive lot owners. No owner or other individual stands to profit from the provisions of the CCRs or Bylaws, at least to the extent that, as quoted above, the provisions provide that Board members shall not "receive any compensation for acting as such"; HOA "is not organized for profit"; and no member is entitled to receive any profit from HOA or from the operation thereof. The present circumstances are, thus, plainly distinguishable from circumstances where the party that drafted the contract—such as an insurance company— stands to reap a financial benefit if ambiguous language is construed in its favor. HOA, by contrast, is an entity that is not organized for profit and is merely comprised of the lot owners themselves; its Board of Directors is made up of homeowners essentially volunteering their time.

¶ 26 Furthermore, as similarly noted in *Graziano*, although Homeowners may not have had the ability to negotiate the terms at the time of the purchase of their property in 1991, since that time it was within their power to at least attempt to change the provisions in accordance with Article 8, the amendment provision in the Bylaws.

¶ 27 It might nevertheless be argued that, as a practical matter, the CCRs and Bylaws are non-negotiable terms bundled into the home purchase. Furthermore, the view that covenants are drafted solely for the benefit of the "land" or the owners, rather than for the benefit, or partial benefit, of specific developers, lenders, or some other outside entity, might be based on inaccurate assumptions. As stated, recently, by one scholar: "[C]ovenants are contracts of adhesion, made up of completely non-negotiable, recorded terms bundled into home acquisition. Developers and lenders generally prescribe the content of such covenants, and they may not reflect community desires or values." Andrea J. Boyack, *Common Interest Community Covenants and the Freedom of Contract Myth*, 22 J.L. & Pol'y 767, 771 (2014). In this regard, Homeowners assert in their appellate brief that "the CCRs were drafted by or on behalf of a professional developer who either personally or through counsel had the wherewithal to know how to redraft and amend as well. [HOA] has become its successor in interest."

¶ 28 However, regardless of whether the CCRs were drafted by a professional developer, only the homeowners, collectively, as members of HOA, stand to lose if it is deter-

4. The *Graziano* Court stated that while the "particular CCRs" presented "do not constitute a contract of adhesion, we do not foreclose the possibility that a future plaintiff could demonstrate that land use covenants, conditions, and restrictions are adhesive. We simply find that given the facts of this case, the CCRs in question are not adhesive." *Id.*

mined HOA had a duty to prevent the erosion of the creek. Simply stated, the primary concerns present when treating, for example, an insurance policy as a contract of adhesion—that the policy was drafted by the defendant/insurance company; that the defendant/insurance company has the financial incentive as a for-profit entity to limit coverage; that the defendant/insurance company has superior bargaining power and knowledge; that the plaintiff/insured was unable to amend the policy provisions—are largely absent in this action against HOA, an entity that is not organized for profit, brought by one of the members of HOA, Homeowners, who did not attempt to amend the provisions, despite having the power to at least attempt do so, for more than fifteen years. As noted by the *Graziano* Court,[5] we need not foreclose the possibility that a future plaintiff could demonstrate that certain covenants and bylaws are adhesive; we simply find that given the circumstances of the present case, the CCRs and Bylaws are not adhesive.

¶ 29 In addition, even in a context where interpretation of an adhesion contract, such as an insurance policy, is clearly at issue, such contracts, "[g]enerally, *absent an ambiguity*, ... are subject to the same rules of construction as other contracts." *Max True Plastering Co.*, 1996 OK 28, ¶ 16, 912 P.2d 861 (emphasis added) (footnote omitted). *See also Carraco Oil Co. v. Mid-Continent Cas. Co.*, 1971 OK 50, ¶ 8, 484 P.2d 519 ("A policy of insurance should be construed *as every other contract*, that is, *where not ambiguous, according to its terms*.") (emphasis added). Although ambiguities in the language of adhesion contracts are construed against the party that drafted the ambiguous language, "[i]f it is not ambiguous, we accept the contract language in its plain, ordinary, and popular sense." *Haworth v. Jantzen*, 2006 OK 35, ¶ 17, 172 P.3d 193 (footnote omitted). Even an adhesion contract, if clear and unambiguous, must be construed according to its terms. *See Fossil Creek Energy Corp. v. Cook's Oilfield Servs.*, 2010 OK CIV APP 123, ¶ 12, 242 P.3d 537 ("Where the language of a contract is clear and unambiguous on its face, that which stands expressed within its four corners must be given effect.") (citation omitted). In this regard, Homeowners assert in their appellate brief that the contract language at issue is not ambiguous and that the intention of the parties can be gleaned from a four-corners examination of the CCRs and Bylaws.

### III. The Responsibility of HOA Under the CCRs and Bylaws

¶ 30 Section 9 of the CCRs provides that HOA is "responsible for the maintenance, repair, alteration, remodeling, and insurance (hazard and liability) of the Common Elements...." Subsection 4.3.3 of the Bylaws provides that HOA's "powers and duties" include the "Maintenance" duty of "keep[ing] in good order, condition, and repair all of the Common Elements...."

¶ 31 However, HOA's responsibilities in this regard are further defined under subsection 4.3.11 of the Bylaws as "mak[ing] repairs, additions, alterations, and improvements to the Common Elements consistent with managing the Project in a first class manner *and consistent with the best interests of the Lot Owners*." (Emphasis added). HOA's responsibility to make repairs, additions, alterations and improvements "consistent with the best interests of the Lot Owners" is related to the obligation of the lot owners themselves to pay for such maintenance or, at least, for the insurance coverage. That is, all the homeowners are required to contribute, collectively and in equal amounts, toward any assessment imposed by the Board of Directors to meet any common expenses. In this regard, subsection 13.6 of the CCRs states that the Board is not to make any assessment that "inure[s] to the benefit of any Lot Owner or individual" unless the lot owners "receive the benefits from the maintenance, repair, operations, additions, alterations, improvement, and insurance responsibility of the Association."

¶ 32 HOA's responsibilities are further curtailed by the parallel duty of all the lot owners, individually, to be "responsible for all portions" of their individual lots, including

5. *See* n.4, *supra*.

all "maintenance, repair, alteration, remodeling, and insurance (hazard and liability)," and the responsibilities to keep their individual lots "in a well maintained, safe, clean, and attractive condition at all times," and to "perform promptly, at [their] own expense, all maintenance and repair work of [their] Lot[s] (whether improved or not)...."

¶ 33 The exhibits reveal that Homeowners' lot is the closest property in the neighborhood to the creek. Even the home of Homeowners' immediate neighbor has considerably more of a "buffer zone" between it and the creek because the street along which those houses in the neighborhood were constructed runs at an angle away from the creek. Thus, an erosion prevention project undertaken by HOA would potentially have benefitted Homeowners, but there is no indication it would have provided a benefit to the other lot owners as contemplated under 13.6 of the CCRs. Instead, the other lot owners would have been required to contribute toward a project benefitting one lot owner, Homeowners, who purchased the home built closest to the natural creek,[6] the banks of which were already partially within Homeowners' property line when they purchased the lot,[7] and despite the plain duties set forth in the CCRs and Bylaws regarding lot owners' responsibilities to their individual lots.

¶ 34 We emphasize that it is the plain language of the CCRs and Bylaws that provides that assessments by the Board be made "consistent with the best interests of the Lot Owners." In the present case, Homeowners were effectively requesting that HOA prevent the natural erosion of a creek bank. It is undisputed that such a project would have been costly,[8] it would have directly benefitted only one lot owner, and it would have involved potential unintended consequences.

¶ 35 Importantly, Homeowners' complaints to HOA were not in regard to a concrete drainage channel that was crumbling. Rather, the channel at issue has, from the time of Homeowners' purchase of their lot in 1991, and as the photographs in the exhibits reveal, consisted of a pristine and natural creek with banks of soil and vegetation. If HOA installed, for example, concrete walls along the banks of the creek, such an act would obviously have led to the transformation of a natural creek into a concrete drainage channel—more than mere maintenance or repair.

¶ 36 Indeed, a natural creek is distinct in several illuminating ways from a concrete drainage channel. If a concrete drainage channel were located within the Common Elements and began to crumble, it is plausible that a duty would have arisen on the part of HOA to repair the damaged structure. However, when dirt eroded off the banks of the creek as a result of heavy rainfall and the swift flow of water in the creek, that, by itself, did not trigger a duty on the part of HOA to replace the dirt or prevent such erosion.[9]

---

**6.** No doubt Homeowners benefitted from their proximity to the creek for the first fifteen years or so after they purchased the property. In this regard, one scholar has stated: "Water's allure powerfully draws humans to its ... life-giving properties and aesthetic pleasures. To many, living close to the water is an idyllic lifestyle, a goal and a mark of achievement. Water, however, can be as dangerous as it is beautiful, turning violent at the slightest provocation from wind or gravity to destroy our works and possessions and take our lives." James Wilkins, *Is Sea Level Rise "Foreseeable"? Does It Matter?*, 26 J. Land Use & Envtl. L. 437, 437 (2011).

**7.** *See* n.9, *infra*.

**8.** For example, Homeowners' Exhibit 35 is a letter, dated November 30, 2010, to Homeowners from an engineering firm setting forth several options "for mitigating the stream bank erosion problem ... at [Homeowners'] property." The

costs of the options range from $150,000 (for fabric form stabilization in which "[m]ats of fabric forms" would be "anchored to the creek bank and laid over the exposed bank") to more than $600,000 (for a twenty-foot tall concrete retaining wall along Homeowners' property).

**9.** We note here that since 2010, a portion of a certain railroad-tie retaining wall collapsed. However, as stated in the trial court's Order, "[Homeowners themselves] determined that their property line ... extended out past" that particular "retaining wall." Order at p. 7. In this regard, we note that the exhibits appear to indicate the property line dividing the Common Elements and Homeowners' property ran at an angle to the creek bank such that a portion of the creek bank, even prior to 2010, was within Homeowners' property, though a larger portion was within the Common Elements. *See, e.g.,* Court Exhibits 1–3. However, the trial court based its ruling on the scope of HOA's duty rather than on

¶ 37 This line of inquiry reveals a further distinction between a natural creek and a concrete channel: the fact that the creek was widening within the Common Elements cannot, by itself, be viewed as constituting damage to the Common Elements. In fact, the natural widening of the creek, if anything, may decrease the likelihood of future storm events causing water to overflow the creek banks and flood surrounding properties. However, even if this is not the case, it is clear that, when viewed strictly from the point of view of HOA and its maintenance duty to the Common Elements, the natural erosion of the creek banks within the Common Elements did not trigger a duty to prevent the widening of the natural creek in any plain or ordinary understanding of the words maintain or repair.

¶ 38 Clearly, from Homeowners' perspective, the widening of the creek did threaten, and eventually led to, damage to their lot. However, as stated above, Homeowners were "responsible for all portions" of their lot, including all "maintenance, repair, alteration, remodeling, and insurance (hazard and liability)[.]" Further clarification is also found in subsection 15.3 of the Bylaws. This provision, quoted in full above, provides that Homeowners are responsible for obtaining appropriate insurance coverage, including hazard, property, or casualty insurance, "for any loss ... inflicted upon any Lot ... brought about by flooding, water damage caused by bursted pipes, acts of God or other force majeure." Subsection 15.3 further provides that "[i]t is intended that for losses of this nature, each Owner will bear the same or effect his own insurance to cover the same."

¶ 39 The Oklahoma Supreme Court has stated:

By statute in Oklahoma, particular clauses of a contract are subordinate to its general intent. The mutual intent of the contracting parties should be arrived at by examination of the language of the entire contract. A particular clause will not control if it is violative of the parties' general intent even though persuasive in isolation.

*Golsen v. ONG W., Inc.*, 1988 OK 26, ¶ 17, 756 P.2d 1209 (citations omitted). Pursuant to

our discussion above, we conclude subsection 15.3 of the Bylaws is not violative of the general intent of the CCRs and Bylaws. As discussed above, assessments are to be made only in the best interests of the lot owners and any assessment that "inure[s] to the benefit of any Lot Owner or individual" is to be made if the lot owners "receive the benefits" from the maintenance or repair. Subsection 15.3 then explicitly provides that HOA is not responsible for damage to an individual lot owner's property caused by "flooding," "water damage caused by bursted pipes," "acts of God," "force majeure," or "losses of this nature." The damage in the present case was the result of natural erosion of the banks of the creek, erosion which, as discussed above, cannot viewed as having damaged the Common Elements nor as having caused damaged to other lot owners, other than Homeowners. Rather, the creek widened as a result of increased rainfall and water flow. We conclude that if the HOA had prevented the widening of the creek, this would *not* have constituted "repair" of the Common Elements in any plain or ordinary sense, nor would such an undertaking have constituted "maintenance" of the creek because the creek, unlike a concrete drainage channel, was widening only as the result of natural processes.

¶ 40 Moreover, these natural processes are of the same nature as the "flooding," "water damage caused by bursted pipes," "acts of God," "force majeure," or "losses of this nature" excluded from the responsibility of HOA under subsection 15.3. *See Facto v. Pantagis*, 390 N.J.Super. 227, 915 A.2d 59, 62 (2007) ("A *force majeure* clause must be construed, like any other contractual provision, in light of 'the contractual terms, the surrounding circumstances, and the purpose of the contract.'") (citation omitted). In fact, evidence was presented that the damage to Homeowners' property, which began in 2010, was the result of a 500–year rainfall event, an event which was clearly outside the control of HOA.

¶ 41 However, although subsection 15.3 is relevant to our determination of the parties'

any finding that the creek bank was within

Homeowners' property.

intent, our determination does not rest primarily on that provision. As stated above, the widening of the creek, by itself, did not constitute damage to the Common Elements. Moreover, Homeowners' were "responsible for all portions" of their lot, including all "maintenance, repair, alteration, remodeling, and insurance (hazard and liability)," and the responsibilities to keep their lot "in a well maintained, safe, clean, and attractive condition at all times," and to "perform promptly, at [their] own expense, all maintenance and repair work of [their] Lot (whether improved or not)[.]" An assessment by the Board to prevent the erosion of the creek bank within the Common Elements would not have been consistent with the best interest of all the lot owners because it would have benefitted only Homeowners, and the widening of the creek bank within the Common Elements was not otherwise disadvantageous to the other lots, or damaging to the Common Elements. Thus, an assessment to undertake a project to prevent creek erosion would have constituted a benefit to but one lot owner without benefitting other lot owners. Furthermore, such an assessment by the Board would have gone beyond HOA's duty to the Common Elements and lot owners, and would have constituted an assumption by HOA of Homeowners' own responsibilities to all portions of Homeowners' property. The CCRs and Bylaws clearly curtail the duties of HOA based, among other things, on the facts that the lot owners, and only the lot owners, constitute the members and financial contributors to HOA; that any assessment it makes must be covered equally by all lot owners; and that lot owners are themselves responsible for their own individual lots. Although HOA has a duty "for the maintenance, repair, alteration, remodeling, and insurance (hazard and liability) of the Common Elements," the lot owners have a parallel duty to their own properties. Furthermore, as set forth above, we disagree with Homeowners that, under the circumstances of this case, the CCRs and Bylaws constitute a contract of adhesion.

¶ 42 Upon our review of all the relevant contractual provisions, we conclude the trial court did not err in concluding the duty of HOA under the CCRs and Bylaws did "not include a duty to affirmatively install erosion control" to prevent the natural erosion of the creek bank in question. Moreover, the trial court found HOA's duty to maintain and repair required it, instead, to "keep[] the channel free of debris and fallen trees," and found HOA met this duty by keeping the creek clear of such debris. Because Homeowners do not challenge the trial court's finding of fact that HOA kept the creek clear of such debris, we affirm this portion of the Order finding HOA satisfied its contractual duty in this case.[10]

### IV. Tort Theories Based on Common Law Duty and Statutory Duty

¶ 43 Homeowners assert that regardless of the contractual language, HOA owed a duty to Homeowners pursuant to a common law duty created by the relationship between HOA and Homeowners and foreseeability of harm. Citing *Wofford v. Eastern State Hospital,* 1990 OK 77, 795 P.2d 516, Homeowners state in their appellate brief that "[a]s a general rule, a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks which make the conduct unreasonably dangerous." However, HOA did not undertake any conduct other than to remove debris from the creek. HOA did not undertake an excavation or construction project in the creek; rather, the banks of the creek eroded as the result of natural processes involving rainfall and water flow. Furthermore, the natural processes involved were "so apparent and readily observable that one would reasonably expect them to be discovered." *Nicholson v. Tacker,* 1973 OK 75, ¶ 9, 512 P.2d 156 (citation omitted). Finally, as

**10.** Homeowners, quoting *Estate of Hicks v. Urban East, Inc.,* 2004 OK 36, 92 P.3d 88, assert that "an action for breach of contract and an action in tort may arise from the same set of facts and that a person injured by the substandard performance of a duty derived from a contractual relationship may rely on a breach of contract or tort theory, or both." *Id.* ¶ 14. Hence, our conclusion that HOA satisfied its contractual duty in this case pertains both to Homeowners' breach of contract theory and Homeowners' tort theory premised on a breach of a contractual duty. Both theories were properly denied by the trial court.

discussed above, Homeowners had their own contractual duty to be "responsible for all portions" of their lot, including all "maintenance, repair, alteration, remodeling, and insurance (hazard and liability)." We reject Homeowners' assertion that HOA owed a duty to Homeowners to prevent the natural erosion of the creek bank based on common law principles.

¶ 44 Furthermore, Homeowners' tie their tort theory based on a common law duty together with their tort theory based on statute. That is, Homeowners assert HOA owed a duty to Homeowners based on 60 O.S. 2011 § 66, which provides as follows:

> Each coterminous owner is entitled to the lateral and subjacent support which his land receives from the adjoining land, subject to the right of the owner of the adjoining land to make proper and usual excavations on the same for purposes of construction, on using ordinary care and skill, and taking reasonable precautions to sustain the land of the other, and giving previous reasonable notice to the other of his intention to make such excavations.

¶ 45 However, 66 applies where there is some "excavation on adjoining property...." *DuLaney v. Okla. State Dep't of Health*, 1993 OK 113, ¶ 17, 868 P.2d 676. For example, in *DuLaney*, § 66 was found to be applicable where the Oklahoma State Department of Health had authorized a company *to excavate certain property for purposes of creating a landfill* and the adjacent property owners challenged the authorization on various grounds. As HOA asserts, "The purpose of ... § 66 is to place a duty on a property owner to use reasonable care when excavating on their own property so that an adjacent property owner's property is not damaged." Indeed, Homeowners themselves quote the following language in their appellate brief regarding § 66: "The law in this respect attempts to strike a balance between the right of landowners to improve and to use their land, and the duty of landowners to avoid foreseeable harm to improvements on adjoining property."[11]

¶ 46 In the present case, however, no excavation has been proposed or undertaken by HOA. Rather, the creek has widened as a result of natural processes. Although § 66 applies when an adjacent property owner is making "excavations ... for purposes of construction," and requires that such a property owner, when undertaking such a project, "us[e] ordinary care and skill," "tak[e] reasonable precautions to sustain the land of the other," and "giv[e] previous reasonable notice to the other of his intention to make such excavations," there is no basis in § 66 to find it applies in circumstances where a natural body of water, such as a creek, is undergoing natural erosion along a property line.

¶ 47 Section 66 was enacted in 1910, and has remained unchanged since that time. In *Connally v. Woods*, 1913 OK 213, 39 Okla. 186, 134 P. 869, the statute in question was found to apply, but that case involved one party "making [an] excavation ... [that] brought the surface of the lots down several feet lower than an adjoining lot...." *Id.* ¶ 1. In *Lincoln Bank & Trust Co. v. Neustadt*, 1996 OK CIV APP 10, 917 P.2d 1005, the statute in question was found to apply, but that case involved one party "excavat[ing] land on their property to build a parking garage." *Id.* ¶ 1. Finally, in *DuLaney*, the statute was found to apply, but, as stated above, one party was undertaking to excavate land in order to create a landfill site.

¶ 48 To find that § 66 applies under the circumstances of the present case would be inconsistent with all prior cases in Oklahoma applying § 66 because the present case does not involve an excavation of any kind by HOA. Moreover, such a finding would be tantamount to reading requirements into the statute that do not appear on its face, and, further, such a finding would fail to afford § 66 a reasonable and sensible construction.[12] As Homeowners admit, "courts may

---

**11.** Br.-in-chief at 17 (quoting *XI Props., Inc. v. RaceTrac Petroleum, Inc.*, 151 S.W.3d 443, 448 (Tenn. 2004).

**12.** The Oklahoma Supreme Court has stated:

> The Legislature's intent in passing the law submitted for judicial testing governs its construction. The language of an entire act is afforded a "reasonable and sensible construction" in a manner consistent with other stat-

not expand or narrow a plainly worded statute under the guise of [statutory] construction." We find unpersuasive Homeowners' argument that 66 applies to the circumstances of this case.

## CONCLUSION

¶ 49 We conclude that, given the circumstances of the present case, the CCRs and Bylaws are not adhesive. Furthermore, although HOA was contractually "responsible for the maintenance, repair, alteration, remodeling, and insurance (hazard and liability) of the Common Elements," Homeowners had a parallel responsibility: they were "responsible for all portions" of their lot, including all "maintenance, repair, alteration, remodeling, and insurance (hazard and liability)." An erosion prevention project undertaken by HOA would potentially have benefitted Homeowners; however, there is no indication it would have provided a benefit to the other lot owners as contemplated by the CCRs and Bylaws. Indeed, the widening of the natural creek within the Common Elements did not, by itself, damage the Common Elements or otherwise trigger a duty of HOA to maintain or repair the Common Elements. Thus, an assessment to undertake a project to prevent natural creek erosion would have constituted a benefit to only one lot owner without benefitting the other lot owners or the Common Elements. Furthermore, such an assessment by the Board would have gone beyond HOA's duty to the Common Elements and the lot owners, collectively, and would have constituted an assumption by HOA of Homeowners' own responsibilities to all portions of Homeowners' individual property. We conclude the trial court did not err in concluding

HOA's duty to maintain and repair the Common Elements did not require it to prevent the natural erosion of the creek bank, and that HOA satisfied its duty by removing debris from the creek. Finally, we find unpersuasive Homeowners' argument that the trial court erred in rejecting their tort theories based on a common law duty or a statutory duty. We affirm.

¶ 50 **AFFIRMED.**

THORNBRUGH, P.J., concurs, and RAPP, J., dissents.

RAPP, J., dissenting:

¶ 1 I dissent. Simply stated, Homeowners were members of HOA. The duty of HOA was to maintain, for the common good of each member, the common areas of the Association.

¶ 2 Homeowners purchased property within the Oaks subdivision that bordered a common area and contained, as part of this common area, a free-flowing creek. Creeks and streams are known to cause accretion and deletion of property adjacent to them.[1]

¶ 3 The trial court here found that HOA had a duty to maintain and repair the common area, but not to install erosion control of the creek bordering and contained in the common area. Knowing that deletion is in any free-flowing stream, HOA had a duty to guard against and be proactive in the maintenance of the stream banks. HOA was put on notice that all was not stable when the creek caused a tree to topple into the water due to undercutting its support. This warning affected not one single lot owner, but all within that creek area's common boundary.

utes. It is presumed "the Legislature expressed its intent in the statute ... and ... intended what it expressed." When the language of the statute is plain, it will be followed without further inquiry. When further inquiry is needed, this court is "not free to rewrite the statute. ... [T]he sole function of the courts—at least where the disposition [called for] by the text is not absurd—is to enforce it [the statute] according to its terms." Courts must "if possible, construe a statute to give every word some operative effect" and vigorously "resist reading words or elements into a statute that do not appear on its face." The legislature expresses its purpose by words. "It is for [this court] to ascertain [the meaning of these words]—nei-

ther to add nor to subtract, neither to delete nor to distort." This court is thus without authority to supplement by judicial interpretation the classification of persons subject to statutory authority "but must accord the language used by the Legislature, it being unambiguous, ... fair, reasonable, plain and ordinary import or meaning."
*Okla. City Zoological Trust v. State ex rel. Pub. Employees Relations Bd.*, 2007 OK 21, ¶ 6, 158 P.3d 461 (footnotes omitted).

1.  This area of law is so well known that citations are not necessary.

¶4 I would hold that HOA violated HOA covenants and bylaws under the guise that failure to prevent erosion would, by some stretch of logic, benefit only Homeowners and not other lot owners, ignoring that water finding an easier path will do so and affect others. HOA performed, at best, a diminished action by keeping the streambed clear and ignoring the erosion at its own peril.

¶5 Accordingly, I would reverse and remand.