TINKER FEDERAL CREDIT UNION v. LITICKER
2023 OK CIV APP 6
Case Number: 118884
Decided: 04/11/2022
Mandate Issued: 03/02/2023
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2023 OK CIV APP 6, __ P.3d __

 

TINKER FEDERAL CREDIT UNION, Plaintiff/Appellee,
v.
GERALD LITICKER, Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE DON ANDREWS, TRIAL JUDGE

AFFIRMED

Jeffery S. Ludlam, Spencer Habluetzel, HALL & LUDLAM, PLLC, Oklahoma City, Oklahoma, for Plaintiff/Appellee

Sherry Doyle, SHERRY DOYLE, PLLC, Edmond, Oklahoma, for Defendant/Appellant

DEBORAH B. BARNES, PRESIDING JUDGE:

¶1 In this action for replevin of a vehicle and for a money judgment, Gerald Liticker appeals from the trial court's order granting summary judgment to Tinker Federal Credit Union (TFCU) on his counterclaims. We affirm.

BACKGROUND

¶2 As detailed in TFCU's appellate brief,

On February 13, 2010, Mr. Liticker signed an installment contract (Contract 1) to purchase a used 2001 Cadillac Deville (Collateral 1) from Bob Moore Pontiac-Buick-GMC (Dealer 1).

Contract 1 was specifically secured by Collateral 1 and, on the face of the contract, was assigned the same day to TFCU.

Mr. Liticker knew and understood TFCU was the assignee of Contract 1.

On May 6, 2010, Mr. Liticker signed an installment contract (Contract 2) to purchase a used 1998 Lincoln Continental (Collateral 2) from Bob Howard Honda/Acura (Dealer 2).

Contract 2 was specifically secured by Collateral 2 and, on the face of the contract, was assigned the same day to TFCU.

Mr. Liticker initially did not want TFCU to be the assignee of Contract 2, but ultimately acquiesced to TFCU as assignee.

As set out below, both contracts contain a "Security Agreement" on the first page of the contracts in the top right corner.

Both contracts contain the following "Events of Default" provision:

Buyer shall be in default under this Agreement upon the happening of any one or more of the following events or conditions, herein called "Events of Default":

. . . .

2. Any payment required hereunder or under any other note or obligation of Buyer to this Seller/Secured Party or to others is not made when due or in accordance with terms of the applicable contract.

. . . .

8. Any time Seller/Secured Party in its sole discretion believes the prospect of payment or performance of any liability, covenant, warranty or obligation secured hereby is impaired. . . .

Both contracts also contain a "Disclaimer of Warranties" provision on the first page, bottom left, which states, in part, as follows:

Seller's oral statements about the property described herein do not constitute warranties and shall not be relied upon by Buyer. To the extent permitted by law, Seller disclaims all express and implied warranties (including, without limitations, the implied warranties of MERCHANTABILITY and fitness for a particular purpose) with respect to the goods sold. . . .

Mr. Liticker did not read the Security Agreement in either contract before signing his name directly under the Security Agreement terms and conditions, because it was too long, and he did not want to read it.

Mr. Liticker did not read the Events of Default provisions of either contract.

Mr. Liticker admits he was contractually bound by the terms of both contracts.

The first payment due under Contract 1 was on May 14, 2010.

Mr. Liticker never made a payment on Collateral 1.

On May 25, 2010, Mr. Liticker voluntarily surrendered Collateral 1 and TFCU repossessed it.

¶3 Mr. Liticker asserts he surrendered Collateral 1 to TFCU, the assignee, because at the time he purchased the vehicle, the "check engine" light was on; however, he asserts, Dealer 1 assured him the issue causing the signal would be fixed. He claims the purchase of the vehicle would not have occurred but for this promise to Mr. Liticker. He admits he made no payments for Collateral 1, but asserts he continued making payments on Collateral 2 during the litigation. He asserts he made the final payment on Collateral 2 in November 2012. He further states he made a written demand that the lien be released with his final payment, but TFCU refused to release the lien.

¶4 On August 13, 2010, TFCU filed suit after Mr. Liticker's first-payment default under Contract 1 and surrender of Collateral 1. TFCU sought money judgment on both contracts and replevin of Collateral 2. Mr. Liticker filed an answer and counterclaim in 2012 and amended his counterclaims in 2014. His answer denied all TFCU's material allegations and asserted affirmative defenses of lack of standing, no default, and no cross-collateralization, and his counterclaims alleged violations of the federal consumer credit protection act, unfair and deceptive trade practices, breach of contract and intentional infliction of emotional distress, and made a request for attorney fees. The parties conducted discovery and filed several summary judgment motions. On July 25, 2014, Mr. Liticker amended his counterclaims by adding specific references to various consumer protection statutes including the Oklahoma Consumer Protection Act (OCPA), a failure to provide a lien release claim, and an unconscionabiliy claim.

¶5 In September 2014, the trial court granted TFCU partial summary judgment on its claim for Contract 1 and awarded a money judgment, leaving Contract 2, the related replevin claim, and Mr. Liticker's counterclaims.

¶6 Among other arguments, TFCU argued Mr. Liticker's third claim regarding unfair and deceptive trade practices does not apply to it because the OCPA does not apply to "lending transactions" and other entities regulate it. Additionally, it argued filing a lawsuit to enforce its rights is not a deceptive or unfair trade practice. It further argued it was entitled to summary judgment on Mr. Liticker's fourth claim alleging breach of contract because it did not breach the contract by enforcing its rights and Mr. Liticker was in breach of the contracts first. TFCU argued that Mr. Liticker's first payment on Contract 1 was due May 14, 2010, and that he executed Contract 2 on May 6, 2010. Mr. Liticker, it argued, admits he surrendered Collateral 1 to TFCU on May 25, 2010, and had not made any payments under Contract 1. Pursuant to the Events of Default provision of the contracts, it argued Mr. Liticker was thus in default on Contract 2 before the first payment on Contract 2 was due. It also argued its refusal to release the lien on Collateral 2 is not a breach of contract because the contracts are cross-collateralized. It argued it was entitled to judgment on Mr. Liticker's fifth claim regarding its alleged failure to provide a lien release on Collateral 2 because the claim was outside the statute of limitations and because Collateral 2 cross-collateralizes Contract 1.

¶7 Mr. Liticker filed a response in which he asserted, among other arguments, that to the extent TFCU argues there is an ambiguity in the contracts, the contracts must be strictly construed against it. He argued, however, there is no ambiguity and TFCU does not assert there is any ambiguity in the contracts. He further argued that TFCU was attempting to rewrite the contracts to provide for cross-collateralization, which, he argued, was not in accord with the contracting parties' intention and was in violation of state and federal consumer protection laws, including the Uniform Consumer Credit Code (UCCC). He argued that TFCU was not the Seller/Secured Party of either contract and neither dealer asserted a claim in the collateral of the other. Mr. Liticker also argued the OCPA applies because the transactions at issue here are "consumer credit sales," not consumer loans, and TFCU is not a lender because he did not execute a note to TFCU. TFCU, he argued, was merely the assignee of the respective dealer's rights and did not take a security interest in anything; rather, it merely accepted assignment of the respective dealer's security interest. Relying on 14A O.S. § 2-408

¶8 In reply, TFCU reiterated, among other arguments, that under the UCCC the term seller includes an assignee, 14A O.S. § 2-107id. at § 2-408. Thus, it argued, when Mr. Liticker signed Contract 2 "with TFCU indicated as assignee, he was agreeing to the terms in the contract, which cross collateralized his prior debts with TFCU, including the prior credit sale" in Contract 1. It argued it is a related assignee because it is identified on the contracts and it has a continuing relationship with the sellers under dealer agreements.

¶9 The trial court granted summary judgment to TFCU on Mr. Liticker's counterclaims. Mr. Liticker appeals.

STANDARD OF REVIEW

¶10 This appeal arises from the trial court's grant of summary judgment to TFCU on several of Mr. Liticker's counterclaims.

An appellate court tests a trial court's summary judgment grant by a de novo review standard. Although factual matters are considered in ruling on a summary judgment motion, the ultimate decision turns on the purely legal determination of whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions. An appellate court, like a trial court, scrutinizes the pleadings and evidentiary materials submitted by the parties to determine if there is a genuine issue of material fact, and all inferences and conclusions to be drawn from the evidentiary materials must be viewed in the light most favorable to the non-moving party. In such a de novo review the appellate court engages in a plenary, independent and non-deferential re-examination of the trial court's ruling.

Head v. McCracken, 2004 OK 84102 P.3d 670Okla. Dep't of Sec. ex rel. Faught v. Wilcox, 2011 OK 82267 P.3d 106

ANALYSIS

¶11 We agree with TFCU that Mr. Liticker's seven propositions of error on appeal assert four main arguments: (1) whether the trial court erred in finding that pursuant to the UCCC, 14A O.S. 2001 §§ 1-101

I. Validity of Cross-Collateralization Clauses

¶12 TFCU is identified on the front page of both Contract 1 and Contract 2 as "Creditor/Assignee."

2. Agreement Binding on Assignee. This agreement shall inure to the benefit of the . . . assigns of the Seller/Secured Party . . . .
3. Rights of Seller/Secured Party Assignable. Seller/Secured Party at any time and at its option may . . . assign its rights under this Agreement in whole or in part, any . . . assignee shall have all the rights of the Seller/Secured Party as to the rights . . . assigned.

Under the heading "Assignment by Seller and Terms," both contracts provide, in part, that

FOR VALUE RECEIVED, Seller hereby sells, assigns and transfers all of its right, title, and interest in and to the within Contract and the property described therein, to the Assignee shown on the reverse side hereof (herein called "Assignee") . . . with the power to take legal proceedings in the name of the Seller or the Assignees. Seller warrants . . . Seller has taken all steps necessary to perfect the lien granted by this agreement as a First lien and to show Assignee as holder thereof[.]

Each contract further provides, in part, on its first page under the heading "Security Agreement," as follows:

The Undersigned grants to Seller a security interest in Collateral described herein to secure the payment of indebtedness evidenced by RETAIL INSTALLMENT SALES CONTRACT executed herewith and except for collateral which is the consumers (sic) principal dwelling or which is household goods . . . to secure (1) all future advances by Seller to Buyer, (2) all other liabilities to Seller (primary, secondary, direct or indirect, absolute or contingent, sole, joint, or several) due or to become due or which may be hereafter contracted by or acquired of Buyer, and (3) the performance of all agreements, covenants, and warranties of Buyer to Seller. . . .

¶13 Mr. Liticker's signature appears directly after this paragraph in both contracts. Contrary to Mr. Liticker's assertion that Collateral 2 is "additional collateral," we agree with TFCU that the Security Agreement in the contracts at issue were for cross-collateral, not additional collateral. Additional collateral is governed by the provisions of 14A O.S. 2001 § 2-112

A seller in a consumer credit sale of a motor vehicle may secure the debt arising from the sale by contracting for a security interest in any other motor vehicle used for the purpose of transportation of persons or property, as well as the motor vehicle which is the subject of the sale. Provided, further, that the amount of the debt secured by property other than the motor vehicle which is the subject of the sale shall be clearly set forth and when the total debt is reduced to an amount equal to or less than the amount secured by the motor vehicle which is the subject of the sale, a release of the security agreement as to such "other vehicle" will be furnished to the debtor upon request but such partial release shall not impair the security interest on the motor vehicle which was the subject of the sale. The total amount secured by any transaction authorized hereunder cannot exceed the amount of the sale price of the motor vehicle, and further, the seller cannot advance money or other things of value to be included in such consumer transaction.

Cross-collateral is governed by § 2-408, which provides:

(1) In addition to contracting for a security interest pursuant to the provisions on security in sales or leases (Section 2-407) [additional collateral], a seller in a consumer credit sale may secure the debt arising from the sale by contracting for a security interest in other property if as a result of a prior sale the seller has an existing security interest in the other property. The seller may also contract for a security interest in the property sold in the subsequent sale as security for the previous debt.

¶14 As argued by TFCU, Mr. Liticker's reliance on the Oklahoma Supreme Court's decision in First National Bank of Amarillo v. LaJoie, 1975 OK 95537 P.2d 1207LaJoie, § 2-112 had not yet been enacted. At that time, with respect to consumer credit sales, § 2-407 prohibited a seller from taking a security interest in property other than the property sold, except as provided by the provisions of § 2-408 (cross-collateral). 14A O.S. 1971 § 2-407

¶15 As in the present case, the bank in LaJoie was not a signatory on the contract between the dealer and the defendant, and the bank had not loaned money to the plaintiff so he could purchase the vehicle but was identified in the contract as assignee and the defendant knew the bank was financing the purchase of the first vehicle. The LaJoie Court acknowledged that then § 2-407 applied only to consumer credit sales and no similar provision was applicable to consumer loans as defined in, then, 14A O.S. 1971 § 3-104LaJoie, ¶ 17. The Court reasoned, however, that the bank was not a lender but an assignee of the dealer's rights under the contract; consequently, the transaction was not a loan but rather was a consumer credit sale. Id. ¶ 25. In affirming the trial court's order, the Court concluded the security interest in the second vehicle was void and the bank was not entitled to enforce the dealer's interest in the second vehicle. Id. ¶¶ 36, 39. The Court also noted that the bank's reliance on the amended version of § 2-112LaJoie, ¶ 32.

¶16 As set forth in § 2-408, a seller may "secure the debt arising from the sale by contracting for a security interest in other property if as a result of a prior sale the seller has an existing security interest in the other property." Further, "[t]he seller may also contract for a security interest in the property sold in the subsequent sale as security for the previous debt." The language of the Security Agreement in the contracts at issue here provides that the seller may "secure (1) all future advances by Seller to Buyer, [and] (2) all other liabilities to Seller (primary, secondary, direct or indirect, absolute or contingent, sole, joint, or several) due or to become due or which may be hereafter contracted by or acquired of Buyer[.]" Unlike the seller in LaJoie who had not added the second vehicle to the contract as cross-collateral for the debt on the first vehicle, the sellers in the present case bargained for and, through Mr. Liticker's agreement, had the right to secure their respective debts through a security interest in other property pursuant to § 2-408. In this regard, Mr. Liticker's argument that TFCU seeks to enlarge the rights for which the parties bargained is unpersuasive.

¶17 His argument also appears to be that because the sellers did not exercise this right, TFCU as the assignee may not do so. Section 2-107 provides that a "'seller' includes an assignee of the seller's right to payment . . . ." As to what rights an assignee may assert, we find instructive the Court's reasoning in Brannon v. Boatmen's National Bank of Oklahoma, 1999 OK CIV APP 17976 P.2d 1077Brannon Court stated,

[t]his appeal concerns the insurance coverage that a seller/secured party can obtain when their buyer/debtor does not provide insurance as set forth in the financing agreement for the buyer/debtor's purchase of a motor vehicle. The two plaintiffs in this case are buyer/debtors whose financing agreements for the purchase of motor vehicles were assigned to defendant [bank] by the original sellers.

Id. ¶ 1. The bank purchased insurance because the buyers defaulted on their insurance obligations two and four months, respectively, into the loan period. The Court noted that the financing agreements in question gave the seller/secured party the right to reimbursement for insurance if the defendant buyers defaulted on their obligations to insure the collateral. The Court affirmed the trial court's dismissal of the defendants' lawsuit that claimed, in part, that the assignee could not obtain force-placed insurance under the UCCC. The Court specifically noted "[t]he financing agreements expressly reserve the right to the seller/secured party to purchase insurance as it shall require and at its option when the buyer/debtor does not insure the collateral." Id. ¶ 5 (emphasis added). The Court thus concluded the finance agreements and the provisions of the UCCC at issue in that case permitted the assignee bank to purchase the insurance. See also 1999 OK CIV APP 17

¶18 Similar to the facts in the present appeal where the "seller/secured party" did not cross-collateralize their respective contracts, the seller/secured parties in Brannon did not purchase the challenged insurance, the assignee did. It was the finance agreements to which the Brannon Court looked to determine if the assignee had the right to purchase the insurance. Similarly, it is the contract language to which we look to determine the seller/secured party's right to cross-collateralize and thus the assignee's right to cross-collateralize. That the respective seller/secured parties did not cross-collateralize their debt does not extinguish the contract right. TFCU is the party who invoked the contract right. Finally, as was found by the Brannon Court with respect to the UCCC provisions at issue there, as previously discussed herein, the UCCC specifically permits cross-collateralization of debts.

¶19 Though not precisely what he argues, Mr. Liticker seems to further advance the argument that even if TFCU has the right to cross-collateralize the debt in each separate contract, nothing in either contract gives it the right to cross-collateralize the debt in the one contract through the other contract. Thus, for example, in Brannon, the assignee exercised its right against each defendant as to that defendant's contract; the assignee did not reach across contracts to get to the other.

II. Breach of Contracts

¶20 Mr. Liticker argues the trial court erred in finding he was in default under Contract 1 and Contract 2. We disagree.

A. Contract 1

¶21 Mr. Liticker contends he was not in default and thus not in breach of Contract 1 because his evidentiary materials showed Dealer 1 promised to fix Collateral 1, and the purchase of Collateral 1 would not have occurred but for that promise. He maintains Dealer 1 informed him it no longer would attempt to fix the vehicle and he so informed TFCU and asked for its help, but TFCU said there was nothing it could do to help. TFCU told him it had nothing to do with the sale or any promises made by Dealer 1. He claims TFCU's response was a breach of the duty of good faith and fair dealing under the Uniform Commercial Code and a breach of the promise Dealer 1 made that induced him to execute the contract. The only legal authority Mr. Liticker cites is 16 CFR Part 433, and argues "[t]he so-called FTC [Federal Trade Commission] Holder-Rule preserves a consumer's right to assert the same legal claims and defenses against anyone who purchases the credit contract as they would have against the seller who originally provided the credit."

¶22 A creditor is defined in 16 C.F.R. § 433.1(c), in part, as a "person who, in the ordinary course of business, . . . finances the sale of goods or services to consumers on a deferred payment basis[.]" "Financing a sale," is defined as "[e]xtending credit to a consumer in connection with a 'Credit Sale' within the meaning of the Truth in Lending Act and Regulation Z," id. § 433.1(e), and defines "Consumer credit contract" as "[a]ny instrument which evidences or embodies a debt arising from . . . a 'financed sale,'" as defined in subparagraph (e), id. § 433.1(i). Further, "Business arrangement" is defined as "[a]ny understanding, procedure, course of dealing, or arrangement, formal or informal, between a creditor and a seller, in connection with the sale of goods or services to consumers or the financing thereof." Id. § 433.1(g). A credit sale is defined in 12 C.F.R. § 226.2(16) Regulation Z to mean:

a sale in which the seller is a creditor. The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer --
(i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
(ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

A consumer credit sale is defined by UCCC § 2-104 as

a sale of goods, services or an interest in land in which
(a) credit is granted by a person who regularly engages as a seller in credit transactions of the same kind;
(b) the buyer is a person other than an organization;
(c) the goods, services or interest in land are purchased primarily for a personal, family or household purpose;
(d) either the debt is payable in installments or a credit service charge is made; and
(e) with respect to a sale of goods or services, the amount financed does not exceed Fifty Thousand Dollars ($50,000.00) . . . .

The contracts at issue here are consumer credit contracts and were assigned to TFCU; thus, the holder-rule appears to apply to the contracts. TFCU does not argue otherwise in its Answer Brief.

¶23 Instead, TFCU argues that Mr. Liticker has no defense against Dealer 1 because it is a defense that rests "on extrinsic evidence to vary the terms of the contracts," citing Grindstaff v. Oaks Homeowners' Association, Inc., 2016 OK CIV APP 73386 P.3d 1035

A contract must be considered as a whole so as to give effect to all its provisions. The language in a contract is to be given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept. If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners examination of the instrument.

Id. ¶ 17 (quoting Pitco Prod. Co. v. Chaparral Energy, Inc., 2003 OK 563 P.3d 541Grindstaff Court further reasoned, "[t]he mere fact the parties disagree or press for a different construction does not make an agreement ambiguous." 2016 OK CIV APP 73Id. (citation omitted).

¶24 As previously noted, neither TFCU nor Mr. Liticker argues the contracts are ambiguous and each contract contains a disclaimer as to oral and implied warranties. Consequently, the contracts must be interpreted without reference to parol evidence as to intent. Even if TFCU is subject to the "so-called FTC Holder Rule," the defense Mr. Liticker asserts is not available against Dealer 1 or, in turn, TFCU.

¶25 Consequently, we conclude the trial court did not err in finding Mr. Liticker breached Contract 1 because the undisputed evidence is that he never made any payment under that contract.

B. Contract 2

¶26 Mr. Liticker also relies on misrepresentations made by Dealer 2 as to the cross-collateralization of the Security Agreement clause in Contract 2 and his assertion that he would not have executed the contract but for the dealer's representation that Contract 2 had nothing to do with Contract 1. This argument again appears to rely on the FTC Holder Rule asserted above. However, as previously discussed herein, the Security Agreement appears on the face of the contracts and was signed by Mr. Liticker. He admits he is bound by the contracts. Each Security Agreement makes clear the seller's right to cross-collateralize the debt. Thus, again, Mr. Liticker does not have a defense against Dealer 2 pertaining to the cross-collateralization clause.

¶27 As noted by TFCU, Mr. Liticker also appears to argue he is not in breach of Contract 2 because TFCU improperly posted payments and falsely reported to the credit reporting agencies that he was delinquent on his payments under Contract 2; thus arguing, in effect, that TFCU breached Contract 2 first. However, as argued by TFCU, Mr. Liticker was almost immediately in breach of Contract 2 because shortly after executing Contract 2, he defaulted on Contract 1 having failed to make the first payment due, or any payment, under Contract 1. This breach occurred before the occurrence of any of the posting and reporting issues as to Contract 2 upon which Mr. Liticker relies.

¶28 Mr. Liticker recognizes the remedies for the "Events of Default" on the back of each contract gives the lender or "that party's successor in interest the right to accelerate payment or performance or require collateral or additional collateral 'at will' or when the 'party deems itself insecure[.]'" He argues, however, "that the party shall have power to do so only if that party in good faith believes that the prospect of payment or performance is impaired," quoting 12A O.S. § 1-309Mitchell v. Ford Motor Credit Co., 1984 OK 18688 P.2d 42

¶29 Section 1-309, titled "Option to Accelerate at Will," provides, in full, as follows:

A term providing that one party or that party's successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or when the party "deems itself insecure," or in words of similar import, means that the party shall have power to do so only if that party in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

(Emphasis added.)Ford Motor, the evidence, admitted by the creditor who repossessed the property, was that the loan was not in default at the time of the repossession. The issue there was whether the creditor had a good faith belief that the loan was in default at the time of repossession. It was in this context that the Court stated:

A secured party who has invoked the provisions of 12A O.S. 1981 § 1--208 [now § 1-309], which afford an option to accelerate the debt at will when proper conditions arise, must show that the statutory power was not exercised arbitrarily or irresponsibly but in good-faith belief that the prospect of payment was impaired.

1984 OK 18

¶30 In this summary judgment proceeding the question, then, is whether there are questions of material fact about Mr. Liticker's default of Contract 2. As argued by TFCU, the "contracts provide that it is a default to fail to pay as obligated, but also for failure to pay under any other obligation to anyone."

¶31 For the foregoing reasons, we conclude the trial court did not err in finding Mr. Liticker breached Contracts 1 and 2.

III. Conversion

¶32 Mr. Liticker maintains "[t]he trial court erred in finding TFCU did not convert [his] property," and argues the trial court erred in finding TFCU was not required to release the lien within seven days on Collateral 2 after the last payment was made on November 5, 2012, in violation of 47 O.S. § 1110

¶33 With reference to the lien release, the trial court found that based on its prior ruling on October 31, 2019 -- an order not designated on appeal by Mr. Liticker -- his "lien release penalty statute claim under 47 O.S. Section 1110 is precluded by the applicable statute of limitations [12 O.S. Section 95(4)]." Mr. Liticker offers no argument on appeal why this finding is in error.

¶34 The trial court found the contracts are cross-collateralized and TFCU may retain its lien on Collateral 2. As previously discussed herein, we agree with the court's determination that the contracts are cross-collateralized, and that Mr. Liticker is in breach of both contracts; therefore, we conclude the trial court did not err in finding TFCU has the right to enforce its lien against Collateral 2.

IV. Applicability of OCPA

¶35 Mr. Liticker argues the trial court erred in determining that the OCPA does not apply to TFCU.

¶36 "Because OCPA is remedial in nature it is to be liberally construed to effectuate its underlying purpose." Patterson v. Beall, 2000 OK 9219 P.3d 839Patterson Court explained that "[i]n the 1960's, individual states began to enact consumer protection laws designed to parallel and supplement Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), which Congress adopted to protect citizens against unfair trade practices." Id. ¶ 27 (citation omitted). State consumer protection laws "derived from various forms suggested to the states by the Federal Trade Commission (FTC) and the Commissioners on Uniform State Laws." Id. ¶ 27 (footnote omitted). The Court explained that while the FTC Act does not provide for a private right of action, the OCPA, like most state consumer protection acts, does.

¶37 In Green Tree Servicing LLC. v. Dalke, 2017 OK 74405 P.3d 676Patterson Court

¶38 In Green Tree, the defendant purchased a mobile home and financed it through the plaintiff. He made payments for fifteen years, then missed six months of payments and was in arrears. Among other things, the loan agreement allowed the defendant the opportunity to cure the defect during the default period. Id. ¶ 3. The defendant alleged that before the plaintiff filed its lawsuit to repossess the mobile home, he made various efforts to cure the defect and that the plaintiff went out of its way to obstruct his rights to pay and to misrepresent facts in its affidavit pertaining to payments made by a third party on behalf of the defendant to the plaintiff. He argued the trial court erred in granting summary judgment to the plaintiff because material questions of fact remained concerning, among other defenses, his claim that plaintiff engaged in deceptive and unfair trade practices under the OCPA. The Supreme Court concluded summary judgment for the plaintiff was premature because the evidentiary materials revealed plausible arguments that the plaintiff obstructed the defendant's ability to become timely with his payments to avoid foreclosure. Id. ¶ 21.

¶39 In the present appeal, even if a loan transaction tied to an underlying consumer transaction is a consumer transaction within the meaning of the OCPA, we conclude Mr. Liticker has identified no questions of material fact that demonstrate TFCU engaged in unlawful practices under the Act. Thus, the trial court properly granted summary judgment to TFCU on Mr. Liticker's OCPA claim.

¶40 As noted above, the Patterson Court explained the elements needed for the private right of action provided by the OCPA. As the Court noted, "[t]he first element to be proved is that the defendant engaged in an unlawful practice under the OCPA." 2000 OK 92 ¶ 31. The Patterson Court noted that 15 O.S. § 753

¶41 He appears to argue, however, unlawful practices should be attributable to TFCU because, taking Mr. Liticker's assertions as true, Dealer 2 made a misrepresentation about the cross-collateralization of the contracts and TFCU is asserting and enforcing the cross-collateralization clauses. He also appears to argue that Dealer 1's oral representations about "fixing" Collateral 1 are attributable to TFCU. The three following practices set out in § 753, therefore, might apply:

2. [The person] [m]akes a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction;
3. [The person] [m]akes a false or misleading representation, knowingly or with reason to know, as to affiliation, connection, association with, or certification by another;
. . . ;
5. [The person] [m]akes a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith[.]

¶42 Mr. Liticker, however, admits TFCU did not negotiate the contracts, was not present when the contracts were signed, and did not sign the contracts. No evidentiary materials, disputed or otherwise, have been identified by him in the summary judgment record to show TFCU knew or had reason to know about any misleading or false representation such that it had engaged in any unlawful practice.

¶43 As also noted by the Patterson Court, § 753 contains a catchall provision that declares unlawful the commission of any "unfair or deceptive trade practice as defined in section 752 of this title[.]" § 753(20). Pursuant to 15 O.S. Supp. 2002 § 752Id. § 752(14).

¶44 In our view, the same problems addressed above regarding Mr. Liticker's unlawful practices assertions as to other subsections of § 753 fare no better under § 753(20). The summary judgment record is devoid of evidentiary materials raising questions of material fact that TFCU acted to deceive him or that it knew or had reason to know of the dealers' alleged breach of warranty or misrepresentations. The actions of which he complains are TFCU's efforts to enforce its rights under the cross-collateralization clauses in the contracts. Additionally, Mr. Liticker has cited to no authority that finds a seller's or its related assignee's enforcement of a cross-collateralization clause permitted under the UCCC is an action that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

¶45 The circumstances here stand in marked contrast to those addressed by the Oklahoma Supreme Court in Green Tree. As discussed above, the Supreme Court concluded the grant of summary judgment was premature because the evidentiary materials revealed plausible arguments that the plaintiff obstructed the defendant's ability to become timely with his payments to avoid foreclosure. 2017 OK 74

The loan agreement explicitly gave [the defendant] a right to cure missed payments. Based on the evidence, there is a material fact issue as to whether [the plaintiff] was preventing [the defendant] from practicing this right, then acknowledging receipt of funds from [a third party on the defendant's behalf] and cashing the check, or not giving accurate information about the arrearage in general.

Id. ¶ 23. The Court also stated:

Based on the disputed evidence, it is possible that the "Consumer Protection Act" may have been violated and that [the plaintiff] may have acted in bad faith by actively attempting to prevent the opportunity to cure the default. . . . When [] the evidence is viewed in the light most favorable to [the defendant], as we are required to do, there is a question concerning whether [the plaintiff] engaged in deceptive or unfair practices and whether [the plaintiff] acted in good faith regarding [the defendant's] attempt at curing the default.

Id. ¶ 22.

¶46 In contrast to the material questions of fact present in Green Tree, here Mr. Liticker has failed to produce evidentiary materials that establish the first element or present questions of material fact as to this first element of a private right of action under the OCPA; thus, TFCU is entitled to judgment on this issue as a matter of law.

CONCLUSION

¶47 For the reasons stated herein, we conclude the trial court did not err in granting summary judgment to TFCU on Mr. Liticker's counterclaims and finding the contracts at issue were cross-collateralized pursuant to the Oklahoma Uniform Consumer Credit Code, that Mr. Liticker was in default under both contracts, that TFCU could, thus, enforce its lien against Collateral 2, and that there are no controverted material facts present in the summary judgment record that TFCU engaged in deceptive or unfair trade practices under the Oklahoma Consumer Protection Act. Accordingly, we affirm.

¶48 AFFIRMED. 

FISCHER, C.J., and HIXON, J., concur.

FOOTNOTES

See note 8, infra.

See TFCU's motion for summary judgment as to Mr. Liticker's counterclaims; Mr. Liticker's response to TFCU's motion for summary judgment. Further, Mr. Liticker has filed no Reply Brief on appeal contradicting or correcting TFCU's assertion that these facts are undisputed.

(1) In addition to contracting for a security interest pursuant to the provisions on security in sales or leases (Section 2-407), a seller in a consumer credit sale may secure the debt arising from the sale by contracting for a security interest in other property if as a result of a prior sale the seller has an existing security interest in the other property. The seller may also contract for a security interest in the property sold in the subsequent sale as security for the previous debt.

(2) . . . . "Seller" in this section does not include an assignee not related to the original seller.

See, UCCC "Oklahoma Comment" by Bryce A. Baggett and Fred H. Miller. Oklahoma's adoption of the UCCC, "supplemented by Administrator's Regulation Z" of the federal Truth in Lending Act, enabled Oklahoma to seek and receive that exemption. See Bryce A. Baggart and Fred H. Miller, 2000 Supplementary Commentary on the Oklahoma Version of the Uniform Consumer Credit Code.

14A O.S. 2001 § 2-412

The buyer . . . is authorized to pay the original seller . . . until the buyer . . . receives notification of assignment of the rights to payment pursuant to a consumer credit sale . . . and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the buyer . . . the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the buyer . . . may pay the seller . . . .

As previously agreed as undisputed, Mr. Liticker made no payments to anyone under Contract 1 and paid TFCU under Contract 2.

[Dealer 1] did not contract [for Collateral 2] to secure Contract 1. Likewise [Dealer 2] did not contract for [the Collateral 1] to secure Contract 2. Thus, TFCU, as assignee, would be barred from using collateral from a different agreement to provide additional security. TFCU would necessarily be required to treat the contracts as separate agreements just as the dealerships would have been required to do if they had not assigned the contracts.

The common use of acceleration clauses in many transactions governed by the Uniform Commercial Code, including sales of goods on credit, notes payable at a definite time, and secured transactions, raises an issue as to the effect to be given to a clause that seemingly grants the power to accelerate at the whim and caprice of one party. This section is intended to make clear that despite language that might be so construed and which further might be held to make the agreement void as against public policy or to make the contract illusory or too indefinite for enforcement, the option is to be exercised only in the good faith belief that the prospect of payment or performance is impaired.

Buyer shall be in default under this Agreement upon the happening of any one or more of the following events or conditions, herein called "Events of Default":

. . . .

2. Any payment required hereunder or under any other note or obligation of Buyer to this Seller/Secured Party or to others is not made when due or in accordance with terms of the applicable contract.

A secured party shall, within seven (7) business days after the satisfaction of the security interest, furnish directly or by mail a release of a security interest to the Tax Commission and mail a copy thereof to the last-known address of the debtor. If the security interest has been satisfied by payment from a licensed used motor vehicle dealer to whom the motor vehicle has been transferred, the secured party shall also, within seven (7) business days after such satisfaction, mail an additional copy of the release to the dealer. If the secured party fails to furnish the release as required, the secured party shall be liable to the debtor for a penalty of One Hundred Dollars ($100.00) and, in addition, any loss caused to the debtor by such failure.

Am. Biomedical Grp., Inc. v. Techtrol, Inc., 2016 OK 55374 P.3d 820See also United States Zinc, Co. v. Colburn, 1927 OK 76255 P. 688

Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein . . . or any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time. The act must be essentially tortious, but it is not essential to conversion sufficient to support the action of trover that the defendant should have the complete manucaption of the property, or that he apply the property to his own use, if he has exercised dominion over it in exclusion of, in defiance of, or inconsistent with the owner's right.

Id. ¶ 7 (emphasis added) (citation omitted).

See, e.g., Dailey v. Barnhart, 1988 OK CIV APP 17768 P.2d 907See also Okla. Dep't of Sec. ex rel. Faught v. Wilcox, 2011 OK 82267 P.3d 106Stonecipher v. Dist. Court of Pittsburg Cnty., 1998 OK 122970 P.2d 182Eason Oil Co. v. Howard Eng'g, Inc., 1988 OK 57755 P.2d 669Steiger v. City Nat'l Bank of Tulsa, 1967 OK 41424 P.2d 69

Ray v. Ray, 2006 OK 30136 P.3d 634Cf. 15 O.S. 2011 § 752

See ¶ 40, infra.

15 O.S. § 753

that the dealers did not contract for "additional collateral";

when he purchased Collateral 1 from Dealer 1, the check-engine light was on, Dealer 1 assured him it would be fixed, and he would not have purchased Collateral 1 but for this oral promise;

at the time TFCU commenced its lawsuit, it knew payments on Collateral 2 were current;

he made the final payment on Collateral 2 during the pendency of the lawsuit, TFCU refused to apply the payments to the proper account and reported a delinquency to the major reporting agencies for twenty-one months; and

he made a written demand that the lien on Collateral 2 be released, but TFCU has refused to release the lien.

Most of these assertions go to TFCU's actions in enforcing its rights to cross-collateralize the contracts and for breach of contract. Having concluded the trial court did not err in finding that the contracts were cross-collateralized, that Mr. Liticker was in breach of Contract 1 and Contract 2, and that TFCU has the right to enforce its lien against Collateral 2 in satisfaction of its lien against Collateral 1, we further conclude none of those actions by TFCU amounts to a deceptive or an unfair trade practice.

Sheffer v. Carolina Forge Co., L.L.C., 2013 OK 48306 P.3d 544Id. Here, there is an absence of undisputed facts or other facts from which reasonable inferences favorable to Mr. Liticker can be drawn.